20 Kan. App. 2d 438 (1995)
In the Interest of D.B.S., a minor child, by and through his guardian ad litem, and P.S., his mother, and G.F., his alleged father, Appellant,
v.
M.S., Appellee.
No. 71,356
Court of Appeals of Kansas.
Opinion filed January 27, 1995.
Donna J. Long, of Vernon, Retter & Long, of Clay Center, for appellant.
Susan C. Jacobson, of Jacobson and Jacobson, of Junction City, for appellee.
Before PIERRON, P.J., LARSON, J., and TIMOTHY E. BRAZIL, District Judge, assigned.
LARSON, J.:
G.F., the putative father, requested under the Kansas Parentage Act, K.S.A. 38-1110 et seq., a judicial determination of the paternity of D.B.S., a child born during the marriage of his mother, P.S., to M.S. After a hearing required by In re Marriage of Ross, 245 Kan. 591, 783 P.2d 331 (1990), the trial court ruled it would not be in D.B.S.'s best interests for blood tests to be ordered for a determination of paternity.
G.F. appeals, contending (1) there was not substantial competent evidence to support the trial court's finding, (2) the trial court erred, as a matter of law, in dismissing the paternity action in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (3) the trial court's ruling destroys the parental preference doctrine by allowing a third party to have custody of a minor child even though the natural parent is fit.
Several novel legal arguments are made which will be addressed, but the decision is essentially fact-driven, and we must first set the stage for this controversy.
The 1980 marriage of M.S. and P.S. resulted in the birth of R.S. in 1981 and D.B.S., the subject of this action, in July 1986. M.S. and P.S. lived together as husband and wife during the time of D.B.S.'s conception and birth. M.S. has at all times believed himself to be and acted as D.B.S.'s father.
*441 G.F. and P.S. maintain that they had a single extramarital encounter, resulting in D.B.S.'s conception. P.S. apparently requested G.F. not to interfere with respect to D.B.S. so she could attempt to make her marriage to M.S. work. G.F. acquiesced in this request and, prior to a divorce action between M.S. and P.S., G.F.'s relationship with D.B.S. was minimal and distant.
The divorce between M.S. and P.S. in 1990 was acrimonious and hotly contested. P.S. first alleged that M.S. was not the biological father of D.B.S., but withdrew her motion for determination of D.B.S.'s parentage upon advice of counsel in hopes of attaining a better position in the custody proceedings and property division. The parties were granted joint custody with the primary residential custody of R.S. and D.B.S. with M.S. and specific visitation rights with P.S. Since the divorce, the parties have continued to be litigious concerning property and child custody issues. P.S. has continually attempted to undermine M.S.'s relationship with D.B.S. and make difficult D.B.S.'s return to M.S. following periods of visitation.
G.F. and P.S. began living together approximately one year before this paternity action was filed in May 1993. A daughter has been born to the relationship of G.F. and P.S. and, during the time of their cohabitation, G.F. developed a "parent-like" relationship with D.B.S. as the result of D.B.S.'s visitation with P.S. Both P.S. and G.F. have told D.B.S. that G.F. is his biological father.
After the filing of the paternity request, the trial court appointed a guardian ad litem to represent D.B.S.M.S.'s motion to dismiss the paternity action was denied, but it was stipulated that Dr. Thomas Coleman would perform a psychological evaluation of all of the parties as a basis to evaluate D.B.S.'s best interests. The parties had previously received the evaluations during the divorce hearing from Drs. Larry Peak, Helen Bontraeger Collins, Robert Sinnett, and Thomas Coleman. At the time of the divorce, G.F. was interviewed by Dr. Peak and reported minimal involvement with D.B.S. and admitted M.S. was functioning as D.B.S.'s father.
The testimony at the Ross hearing was conflicting and spirited. In his testimony, Dr. Coleman opined that D.B.S. was a pleasant *442 and happy child who was doing well in school and got along with everyone. Dr. Coleman stated D.B.S sees both M.S. and G.F. as "dad" but has a close, supportive, and loving relationship with M.S., who supported D.B.S.'s relationship with P.S. and G.F. Dr. Coleman saw P.S.'s negativity and criticism of M.S. as detrimental and her involvement in the paternity action as a way to obtain sole custody of D.B.S. and remove M.S.'s involvement. Dr. Coleman's opinion was that blood tests should not be taken because the test results might cause important relationships to be severed, sabotaged, or discouraged.
Evidence at the hearing indicated D.B.S. had a good relationship with M.S.'s parents. It was clear that D.B.S. desires to continue his excellent relationship with his older brother but has little interest in the adult-generated controversy in which he is minimally involved.
Testimony indicated D.B.S. has a good relationship with J.C., M.S.'s significant other, who along with her daughter has been harassed by P.S.
The guardian ad litem's recommendation, although hesitant, was that since D.B.S. would at some time want to know who his biological father was, it should be determined at this time.
The trial court's extensive factual findings, highly summarized, were as follows:
(1) M.S. has had physical custody of D.B.S. since birth for seven years and has financially and emotionally supported D.B.S. as his child.
(2) Although advised early of the potential parentage, G.F. stayed in the background and did nothing toward asserting his parental rights until his relationship with P.S. was reestablished after her divorce from M.S. and the filing of the present action.
(3) D.B.S. is a normal seven-year-old boy without anxiety or depressive symptoms who enjoys an excellent relationship with his brother and is a happy, friendly, quiet, and thoughtful child.
(4) Based upon substantial competent, professional, and other uncontroverted evidence, the paternity issue is of no consequence or significance to D.B.S.
*443 (5) P.S. lacks sensitivity to her children's needs, over interprets D.B.S.'s attachment to her, and refuses to recognize D.B.S.'s strong attachment to M.S.P.S. was found to have engaged in manipulative techniques and resisted reasonable visitation orders. This thread of noncooperation concerning custody and visitation has continued through the entire post-divorce proceedings, ultimately resulting in P.S. being found to be in indirect contempt.
(6) P.S.'s desire for D.B.S.'s custody was found to have influenced G.F.'s motivation, although the trial court did not find that G.F. was not sincere in his present request for blood testing.
(7) D.B.S. should not be separated from his older brother, although P.S. did not believe separation would be traumatic.
The trial court cited extensively from Ross as well as Jensen v. Runft, 252 Kan. 76, 843 P.2d 191 (1992), considered the matter from the view of the child, and reasoned that in the best interests of D.B.S., blood testing should not be ordered.
The trial court concluded there was substantial competent evidence to support Dr. Coleman's written conclusion:
"I do not believe that P.S. could allow D.B.S. to continue to maintain or develop relationships outside of her realm and that she would have a great deal of influence on his choices in that regard. It would be highly probable that he would lose his contact with M.S., a man who has loved him, taught him and supported him and M.S.'s parents. His relationship with R.S. would become somewhat marginal."
The trial judge adopted that view and found there was substantial evidence to support Dr. Coleman's recommendation, stating: "[I]t is my belief that it would not be in the best interest of D.B.S. to conduct a blood test."
Did the trial court err, as a matter of law, in dismissing the paternity action in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution?
G.F.'s argument that he has a protected liberty interest under the Due Process Clause of the Fourteenth Amendment in his relationship with D.B.S., thereby compelling blood testing at his request, was presented to the trial court in briefs, although it was not extensively argued or ruled upon. M.S. suggests a finding of *444 abandonment might be proper but invited us to deal with the issues so this entire matter might be finally decided.
This issue does not appear to have been raised previously in either Ross or Jensen. The trial court's order was implicitly based upon a legal conclusion that its order was constitutional. Therefore, this is an issue of law over which our review is plenary. Hutchinson Nat'l Bank & Tr. Co. v. Brown, 12 Kan. App.2d 673, 674, 753 P.2d 1299, rev. denied 243 Kan. 778 (1988).
While it is well established in Kansas that "the parents' rights of custody and control of their children are liberty interests protected by the Fourteenth Amendment Due Process Clause," In re Cooper, 230 Kan. 57, Syl. ¶ 1, 631 P.2d 632 (1981), the issue for our determination is: Does G.F. have a constitutionally protected interest sufficient to compel a determination of parentage of D.B.S.?
The existing case law on this issue is found in a series of five United States Supreme Court decisions.
Stanley v. Illinois, 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972), is the landmark case recognizing the constitutionally protected rights of unwed fathers. In Stanley, an unwed father sought to prevent Illinois from removing his children from his custody after the death of their mother without a hearing as to his fitness as a parent. Stanley recognized that putative fathers have a right to notice and hearing in cases threatening their continued association with their children and held that a custodial unwed father is entitled to the same presumption of fitness as a married parent. 405 U.S. at 656-58. It is factually important that in Stanley both parents lived together and had a long-time relationship with their children and that the father had custody of the children.
Quilloin v. Walcott, 434 U.S. 246, 54 L.Ed.2d 511, 98 S.Ct. 549 (1978), involved the claimed constitutional rights of a putative father who had not developed or sought to develop a relationship with his child for 11 years. The putative father challenged a Georgia statute that permitted the adoption of an illegitimate child with only the consent of the mother. It was held there was no need to show the putative father's unfitness absent previous efforts *445 on his part to establish some parental relationship and he could not prevent the adoption of the child by the mother's husband. It was deemed sufficient that the adoption be found to be in the best interests of the child. 434 U.S. at 255.
Quilloin established a limitation on the rights of a putative father recognized in Stanley and sets forth the rule that constitutionally protected rights of a putative father are adequately protected by the best interests of the child test when the putative father has not made any effort to develop a relationship with the child before another man does.
In Caban v. Mohammed, 441 U.S. 380, 60 L.Ed.2d 297, 99 S.Ct. 1760 (1979), the United States Supreme Court considered a challenge to a New York statute that had the effect of preventing an unwed biological father from either adopting his children or preventing their adoption by the mother's husband. In Caban, the biological father had lived with the children and their mother for several years. After the mother left the relationship and took the children with her, she married a man who sought to adopt the children. It was held the father had a constitutionally protected interest which could only be overcome by showing the State had an equally important interest. The decision was rendered on equal protection grounds based on the fact that the statute unjustifiably distinguished between mothers and fathers. 441 U.S. at 394.
The next case chronologically is Lehr v. Robertson, 463 U.S. 248, 77 L.Ed.2d 614, 103 S.Ct. 2985 (1983), which clarified the rights of unwed fathers by considering when those rights attach and the scope of those rights. The Court determined that an unwed father has a constitutionally protected interest in the opportunity to develop a parent-child relationship with his offspring. That constitutional protection is significantly reduced if the father does not establish or seek to establish a relationship with the child. If the father does not act to develop a relationship with the child, he does not even retain a right to notice of pending adoption proceedings. 463 U.S. at 264-65.
Thus, in summary, in Stanley and Caban, the fathers had established a relationship with the children in question and the *446 United States Supreme Court found the fathers' constitutional rights had been violated. In the other two cases, Quilloin and Lehr, because no relationship had been established, the Supreme Court found no constitutional violations.
The most recent United States Supreme Court decision is also the most factually similar to our case. Michael H. v. Gerald D., 491 U.S. 110, 105 L.Ed.2d 91, 109 S.Ct. 2333 (1989), involved the question of whether a biological father of a child born while the mother was married to another man has a constitutional due process right to establish that child's paternity. The child was conceived and born during a marriage that continued at the time the Supreme Court reviewed the case. The child and her mother visited the putative father briefly and had blood tests which showed a 98.07% probability of parentage. When the putative father was prevented from visiting the child, he filed an action in California to establish his paternity and right of visitation. The parties experienced an international lifestyle but the putative father lived with the mother and child briefly during the early period when the action was pending. The mother then reconciled with her husband, who intervened and was granted summary judgment because of California's statutory conclusive presumption of paternity when there is a cohabiting husband who is neither impotent nor sterile. On appeal, the putative father claimed that he was denied his procedural and substantive due process rights.
The United States Supreme Court affirmed in a plurality opinion authored by Justice Scalia. Justice Stevens wrote a separate opinion concurring in the result. Four justices dissented in two separate opinions.
Justice Scalia rejected the notion that biological fatherhood plus an established parental relationship was sufficient to establish a liberty interest and held that the conclusive presumption of the husband's paternity did not violate procedural due process rights of the father. 491 U.S. at 119-21. The opinion reasoned that the proper constitutional question was not the adequacy of the procedures but the adequacy of the fit between the governmental policies (maintaining family integrity and privacy) and the classification used to achieve it (husband of the mother presumed to *447 be the father). 491 U.S. at 119-21. The plurality found that societal traditions had protected the marital family against claims such as those made by the putative father and concluded there was no procedural due process violation.
In reaching this conclusion, Justice Scalia starts with the proposition that the Due Process Clause "affords only those protections `so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" 491 U.S. at 122 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 78 L.Ed. 674, 54 S.Ct. 330 [1934]). He rejects Stanley, Quilloin, Caban, and Lehr as standing for the broader principle that biological fatherhood plus an established parental relationship establish a constitutionally protected liberty interest in a putative father and limits those four cases to the principle that there is a "historic respect  indeed, sanctity would not be too strong a term  traditionally accorded to the relationships that develop within the unitary family." 491 U.S. at 123. Justice Scalia then resolves the substantive due process issue by identifying and implementing the following approach:
"Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has. In fact, quite to the contrary, our traditions have protected the marital family." 491 U.S. at 124.
Justice Scalia cites the following reasons for concluding that a putative father's interest has not been historically protected: The presumption of legitimacy and rationale underlying it, the putative father's lack of power to assert parental rights over a child born during a woman's marriage to another man, and the lack of standing of a putative father to claim paternity. 491 U.S. at 124-126. He then continues:
"Moreover, even if it were clear that one in Michael's position generally possesses, and has generally always possessed, standing to challenge the marital child's legitimacy, that would still not establish Michael's case. As noted earlier, what is at issue here is not entitlement to a state pronouncement that Victoria was begotten by Michael. It is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration. What Michael asserts here is a right to have himself *448 declared the natural father and thereby to obtain parental prerogatives. What he must establish, therefore, is not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded such a father parental rights, or at least not traditionally denied them." 491 U.S. at 126.
Justice Scalia determines the lack of recognition of rights of a biological father of a child born into an existing marriage precludes a constitutional right in such a father. The plurality's conclusion, he notes, is limited to cases in which the husband and wife still reside together at the time of birth and wish to raise the child jointly as their own. 491 U.S. at 129. He notes that a biological father might have a constitutional interest in establishing a relationship with his child where the mother has no husband at the time of birth. "Where, however, the child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter." 491 U.S. at 129.
If we were to apply this reasoning to the instant case, it would mandate a finding that G.F. had no liberty interest to be protected. D.B.S. was born into an existing family, and M.S. and P.S. chose to raise him as their own child at the time of birth and for several years thereafter.
Justice Stevens, in his concurrence in Michael H., found that the California statutory presumption of paternity did not deny putative fathers any rights they might have because California allowed reasonable visitation rights "to any other person having an interest in the welfare of the child." 491 U.S. at 133. Thus, although the putative father might be precluded from establishing that he is a "parent," he would not be precluded from exercising any constitutional rights because he could still prove that he was an other interested person. By this reasoning, Justice Stevens did not have to reach the issue of whether the putative father of a child born to a woman married to another man has a protected constitutional interest. He wrote:
"I therefore would not foreclose the possibility that a constitutionally protected relationship between a natural father and his child might exist in a case like this. *449 Indeed, I am willing to assume for the purpose of deciding this case that Michael's relationship with Victoria is strong enough to give him a constitutional right to try to convince a trial judge that Victoria's best interest would be served by granting him visitation rights." 491 U.S. at 133.
Although the statutory provisions of the Kansas Parentage Act and the California provisions differ materially, the reasoning of Justice Stevens' concurring opinion would result in the conclusion that G.F.'s constitutional rights are not violated. He is not denied the right of visitation by virtue of being denied a proclamation of paternity. In fact, the record shows that G.F. has been able to develop a parent-like relationship with D.B.S. and sees him frequently when he is visiting P.S.
Subsequent to the United States Supreme Court's decision in Michael H., other states have considered questions similar to the one before us. The Wisconsin Supreme Court in In re Paternity of C.A.S., 161 Wis.2d 1015, 1026-28, 468 N.W.2d 719 (1991), concluded that a judicial determination of paternity in an action brought by the putative father was not in the children's best interest, and when the putative father appealed, contending that he had a liberty interest protected by the Due Process Clause of the Fourteenth Amendment in a relationship with the children, it was determined that Michael H. controlled the outcome of the case. Under the reasoning of Justice Scalia's plurality opinion, the Wisconsin court determined there was no liberty interest "rooted in history and tradition" in the putative father of a child born to a woman married to another man. 161 Wis.2d at 1030. The court proceeded to reason that even under the rationale of the dissenting justices, the putative father had no liberty interest.
"These justices did not foreclose the possibility that a putative father could never have a liberty interest in such a case, but instead concluded that the analysis should turn on the level of commitment to the responsibilities of parenthood the father demonstrates. Michael H., 109 S.Ct. at 2352 (Brennan, J., dissenting). The undisputed facts indicate that W.W.W. had only minimal contact with one of the children and did not have a relationship with either of them. We conclude that he did not have a liberty interest in determining his paternity of the children or in a parental relationship with them, as his existing relationship with them was not close to the type of relationship in which the Supreme Court had found a constitutionally protected interest to exist. [Citations omitted.]" 161 Wis.2d at 1030.
*450 The Wisconsin court concluded that "if a putative father of a child born to the wife of another man has not established an actual relationship with that child, he does not have a constitutionally protected interest in establishing his parentage of the child, or in a relationship with that child." 161 Wis.2d at 1031-32.
Other courts have decided constitutional arguments in this type of case in other ways. For example, in Massachusetts the lack of statutory standing of a non-husband of a married woman to establish paternity was not a constitutional problem because the court held the putative father had a right to bring a paternity action in equity if he produced clear and convincing evidence of a substantial parent-child relationship at a preliminary hearing (thus showing he had preserved whatever constitutional rights he might have under Stanley and its progeny). C.C. v. A.B., 406 Mass. 679, 550 N.E.2d 365 (1990). The Supreme Court of Michigan refused to hear the constitutional concerns of a putative father of a child born to a woman married to another man because they were not properly raised on appeal. Girard v. Wagenmaker, 437 Mich. 231, 234-35 n. 3, 470 N.W.2d 372 (1991). Texas courts have held that prohibiting a putative father from establishing paternity violates state constitutional provisions. Henderson v. Wietzikoski, 841 S.W.2d 101, 103 (Tex. App. 1992).
As we have earlier stated, the plurality opinion of Michael H. and Justice Stevens' concurring opinion support the conclusion that G.F. has no constitutional violation of which to complain. Additionally, even if those opinions might be questioned for failing to state a common theory by a majority of the Court, G.F.'s constitutional rights are still not violated.
D.B.S. was born in July 1986 and, according to P.S., G.F. became aware that he might be D.B.S.'s biological father either shortly before or shortly after the birth. Although P.S. and M.S. were divorced in 1990, it was not until P.S. and G.F. began to live together that G.F. established any kind of a relationship with D.B.S. Under the reasoning of Caban and Lehr, any constitutional rights that G.F. might have depend on the relationship he developed with D.B.S. See Weston, Putative Fathers' Rights to Custody *451  A Rocky Road at Best, 10 Whittier L. Rev. 683, 684 (1989) (Lehr stands for the principle that "[i]f the father fails to seize the moment, the opportunity [to develop a parental relationship] could be lost, especially where someone else ... voluntarily assumes the burden of meeting the child's needs both emotionally and financially"); Michael M. v. Giovanna F., 5 Cal. App. 4th 1272, 7 Cal. Rptr.2d 460 (1992) (where an unwed father fails to demonstrate any interest in forming a relationship with the child from the beginning, any rights conferred by the biological connections are lost).
The Massachusetts case of M.J.C. v. D.J., 472 Mass. 389, 390-94, 572 N.E.2d 562 (1991) is instructive and held:
"In August, 1988, the plaintiff told the mother that, if the baby was his, he would take care of her and the baby. The mother indicated that she preferred to allow her husband to assume that he was the father of the child, and the plaintiff went along with this plan....
"....
"... This is not a case where the putative father was prevented from developing a parent-child relationship primarily by the mother's actions. Rather, the probate judge found that the plaintiff did not seek a substantial parent-child relationship with the child during the four and one-half months when he had an opportunity to do so. We reject the contention, at least in this case, that four and one-half months was not sufficient time for the plaintiff to develop more of a relationship."
The evidence at trial showed that G.F. had no involvement with D.B.S. during the first four years of his life and only developed a relationship with him in the last three years. P.S. and M.S. chose to raise D.B.S. together as their own child. G.F. chose not to pursue a relationship with D.B.S. prior to living with P.S., not because he was prevented from doing so, but because P.S. had asked him not to.
G.F. now argues the relationship he has developed with D.B.S. in the past three years is the type which is accorded constitutional protection. It is persuasive to argue that in agreeing to P.S.'s request to stay out of the picture, G.F. surrendered whatever constitutional opportunity he may have had to develop a protected relationship with D.B.S. There is no authority to support the proposition that having surrendered those rights he could later *452 reclaim them by developing a step-father relationship after four years of providing no parental contact or support. We are justified, as the United States Supreme Court did in Lehr, to hold that G.F.'s interest in D.B.S. came too late to preserve any constitutional liberty interest. M.S. voluntarily assumed the duties of paternity long before G.F. acted to secure any rights. Therefore, without following the plurality opinion in Michael H., but relying on the total opinion of the United States Supreme Court therein, we hold the rights of G.F. herein do not amount to a liberty interest sufficient to require that he be granted the requested blood tests.
Further, even if G.F. has a constitutionally protected interest in his parental rights such that he is entitled to a determination of paternity, that interest is not absolute. In determining whether G.F.'s rights were actually violated, it is essential to weigh the State's interest in denying a blood test against the interests of the putative father. The State's interest which blocked the blood test in this case was in the best interests of the child. Therefore, the question of constitutional significance is whether this interest outweighs G.F.'s interests.
On one hand, it is clearly established that parental rights, not the child's best interests, control in custody disputes between parents and non-parents where the parent is fit. See In re Guardianship of Williams, 254 Kan. 814, Syl. ¶¶ 2, 3, 869 P.2d 661 (1994). Similarly, the necessity of a custodial unwed father's consent to an adoption is not eliminated by a finding that the adoption is in the best interests of the child. See Stanley v. Illinois, 405 U.S. 645; Caban v. Mohammed, 441 U.S. 380. A California case held that while the State's interest in the best interests of the child controls, the nature of the relationship between the child and putative father must be considered and, in that case, the putative father's interest in determining his paternity outweighed the State's interest in blocking that determination based on the specific facts of the case. Michael M. v. Giovanna F., 5 Cal. App. 4th at 1285.
On the other hand, most courts that have considered the issue have found that the putative father's interest is justifiably limited *453 by the State's interest in protecting the children who reside therein. Petitioner F. v. Respondent R., 430 A.2d 1075, 1079 (Del. 1981); Happel v. Mecklenburger, 101 Ill. App.3d 107, 118, 427 N.E.2d 974 (1981); Markert v. Behm, 394 N.W.2d 239, 244 (Minn. App. 1986); A v. X, Y, and Z, 641 P.2d 1222, 1227 (Wyo. 1982).
It is clear that a bright line statement that the State's interests in denying a determination of paternity outweigh the putative father's interests is inappropriate. Instead, if G.F., in fact, has a liberty interest, which we do not hold herein, the proper procedure would be to identify with particularity what the State's interests are so that they can be balanced against G.F.'s interests.
2 Schatkin, Disputed Paternity Proceedings § 27.02 (4th ed. rev. 1992), lists several possible State interests:
"The state, as generally reflected in its statutes, has a strong interest in protecting the integrity of the family; in maintaining stable family units, in preserving the emotionally supportive relationship between parent and child; in creating stable families by allowing swift and irrevocable adoption of children as early in their lives as possible; in safeguarding children from any stigma of being born out of wedlock; and in keeping the state's welfare rolls down."
The Kansas Supreme Court has found State interests in providing stability to the lives of children and protecting their physical, mental, and emotional needs. "After the family unit fails to function because of legal dissolution, the child's interests become a matter for the State's intrusion." In re Marriage of Ross, 245 Kan. 591, 602, 783 P.2d 331 (1990). The court has implied that the State's interests might be minimized when the status of the child's paternity is widely known in the community and where the child will be accepted into whichever family the blood tests shows to be biologically his. Jensen v. Runft, 252 Kan. 76, 79-80, 843 P.2d 191 (1992). However, whatever broad interest the State might claim in preventing a determination of parentage do not come into play here. The Jensen court has recently made it plain that the only State interest that justifies denying a blood test is its interest in the welfare of the particular child involved. 252 Kan. at 79 ("In determining the best interests of Luke, it is important to look at it from the child's point of view." Public policy requires courts to act in the best interests of the child.). Thus, *454 if G.F. were determined to have preserved a protected liberty interest, the balancing test in this case would have to be between his interests and D.B.S.'s.
G.F.'s rights are minimized by the fact that he did not develop any meaningful relationship with D.B.S. until after M.S. and P.S. were divorced and D.B.S. was four years old. The United States Supreme Court has held that where the putative father has not developed a relationship, the best interests of the child test, as applied in this case, does not impermissibly infringe on his constitutional rights. While it is true that a natural parent must typically be declared unfit before the best interests of the child test can govern, no such determination is required when the biological father does not develop a parental relationship with the child from birth. Quilloin, 434 U.S. at 255. Thus, even if G.F. does have some degree of constitutionally protected rights, these rights are outweighed by the State's interest in the welfare of D.B.S. and D.B.S.'s own best interests.
We hold that G.F. does not have a constitutionally protected liberty interest; that G.F. did not develop a sufficient relationship with D.B.S. during his early childhood to justify the attachment of such an interest if one existed; and, finally, that when the State's pursuit of the best interests of D.B.S. is tested against the minimal interest of G.F., no constitutionally protected rights were violated under the facts of this case.
Does the trial court's ruling destroy the parental preference doctrine by allowing a third party to have custody of a minor child even though the natural parent is fit?
G.F. argues that because M.S. is permitted custody of D.B.S. without a determination that the biological parents, G.F. and P.S., are unfit, the dismissal of the paternity action violates the Due Process Clause of the Fourteenth Amendment. This is, in reality, just an alternative way of framing the constitutional argument which we have already thoroughly analyzed and rejected. The doctrine of parental preference is based on the due process rights inherent in parenthood as discussed above and is controlled by the same principles. See In re Guardianship of Williams, 254 Kan. 814, Syl. ¶¶ 1-3.
*455 Sheppard v. Sheppard, 230 Kan. 146, 152, 630 P.2d 1121 (1981), cert. denied 455 U.S. 919 (1982), explains: "It is clear under our decisions and those of the United States Supreme Court that a natural parent's right to the custody of his or her children is a fundamental right which may not be disturbed by the State or by third persons, absent a showing that the natural parent is unfit." Some right in G.F. might have existed had he taken responsibility for the child or attempted to develop a substantial relationship soon after the child's birth, which might give rise to some basis for a parental preference argument. However, as we have previously stated, G.F. did not adequately secure whatever constitutional rights he may have, if any, to enjoy the protection of the parental preference doctrine. Not only did he fail to develop a relationship early on, but he also appeared unwilling to do so.
Furthermore, G.F.'s argument presupposes a fact and legal conclusion not before us: that M.S. is not the father of D.B.S. Kansas has a strong presumption of legitimacy and under the facts and ruling of this case, D.B.S. is in the custody of his parent.
Did the trial court err in determining that a blood test was not in the best interests of the child?
G.F. contends the trial court's determination concerning the best interests of D.B.S. is not supported by substantial competent evidence. M.S. argues the correct standard of review is whether the trial court abused its discretion.
We will briefly discuss the differences and the similarities in the standards of review which the parties contend should be applied. However, it matters not which standard we utilize for there was substantial competent evidence upon which the trial court's decision was based and a clear and proper exercise of its discretion in determining the best interests of D.B.S.
In reversing the trial court in Ross, the Kansas Supreme Court held: "Under the facts of this case, the district judge abused his discretion." 245 Kan. at 602. The Ross ruling arose out of the putative father's contention that it was an abuse of discretion for the trial court to have ordered blood tests. Under this scope of review, the test on appeal as stated in Ross is well known:

*456 "The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision. Hoffman v. Haug, 242 Kan. 867, 873, 752 P.2d 124 (1988)." 245 Kan. at 598.
The standard of review applied by the Supreme Court in Jensen v. Runft, 252 Kan. 76, is less clear. This was a four-to-three decision, with the majority seemingly applying a lack of substantial competent evidence standard: "Basically, all of the evidence, including the guardian ad litem's recommendation, indicates that it would be in Luke's best interests to know the identity of his father. The district court erred in holding otherwise." 252 Kan. at 80.
The dissent in Jensen was trying to justify affirming the trial court and disagreed with the majority's characterization of the dispositive issue as "what is in the best interests of Luke." The minority opinion further states:
"In fact, the best interests of Luke was the standard applied by the trial court in the case at bar. The issue on appeal is whether the trial court abused its discretion when it found that a paternity test would not be in the best interests of Luke. The evidence before the trial court amply justifies the trial court's decision. I find no abuse of discretion. I would affirm the trial court." 252 Kan. at 80.
The Wisconsin Supreme Court in In re Paternity of C.A.S., 161 Wis.2d 1015, 468 N.W.2d 719 (1991), in response to the claim of the putative father that the trial court erred in applying the best interests of the child test, opined:
"[W]e conclude that such was not the case. A determination of what is in the best interest of the child is a mixed question of fact and law. [Citation omitted.] The circuit court's findings of fact are sustained unless they are found to be against the great weight and clear preponderance of this evidence. [Citation omitted.] In determining the best interests of the children, it is within the province of the circuit court to determine what weight is given to expert testimony. [Citation omitted.] The ultimate conclusion of the best interest of the child, however, is a matter of law which we review without deference to the circuit court. [Citation omitted.]" 161 Wis.2d at 1036-37.
The Jensen majority's standard of review more closely resembles that in C.A.S. than that of Ross, but the ultimate issue upon which all of the cases agree is that we must finally determine what is in the best interests of the child.
We recognize that a guardian ad litem is appointed whose duty it is to represent the child free of the dispute between adults *457 harboring their own agendas. The role of the guardian ad litem in Ross was criticized by the court, 245 Kan. 597, was not discussed in Jensen, and here resulted in a guarded recommendation for blood testing so long as it did not disturb existing relationships. The guardian ad litem did not even appear in this appeal. In the final analysis, what courts really do is to act as parens patriae, see In re Turner, 94 Kan. 115, 145 Pac. 871 (1915), to determine if the child actually wants or needs to assert the right to identify his or her biological father, or whether the claim is brought for reasons not in the child's best interests.
The best interests of the child test is multi-faceted and complex. The full scope of the factors to be considered varies from case to case. In general terms, it recognizes that "every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of [his or her] parentage." Ross, 245 Kan. at 597. The court can properly consider such factors as the rights and relationships the child has through the presumed father that might be lost by a determination of parentage, the willingness of the biological father to assume the responsibilities of parentage, and whether there is a compelling medical need to determine paternity. Ross, 245 Kan. at 601. The motive of the party bringing the paternity action may be relevant, and indeed of critical importance, but only to the extent it affects the best interests of the child. Ross, 245 Kan. at 597; see Jensen, 252 Kan. at 79. Whether a child's best interests will be served by a determination of paternity depends on such factors as the notoriety of the child's situation in the community and the likely effect a determination of parentage will have on the child's existing relationships. The court can also consider the child's basic interest in simply knowing who his or her biological father is.
"It would be hard to justify telling Luke that because of the acts of Chris, Bruce, and Bob, he will never know with certainty the identity of his biological father, leaving him to ponder whether his `real' father would have rejected him if the courts had ordered blood tests." Jensen, 252 Kan. at 80.
The Washington Supreme Court, in a case cited in Ross, summarized the nature of the best interests of the child test:
"The criteria for determining the best interests of the child are varied and highly dependent on the facts and circumstances of the case at hand. [Citation *458 omitted.] Yet continuity of established relationships is a key consideration. [Citations omitted.] In determining whether it is in the child's best interests to allow a paternity action by one outside the present family, the trial court should consider the stability of the present home environment, the existence or lack thereof of an ongoing family unit, the extent to which uncertainty of parentage already exists in the child's mind, and any other factors which may be relevant in assessing the potential benefit or detriment to the child." McDaniels v. Carlson, 108 Wash.2d 299, 312-13, 738 P.2d 254 (1987).
As one commentator has noted of the test:
"[T]he court will look to the set of circumstances which will afford the child the most positive environment possible under the circumstances.... [T]he review of the circumstances will be made from the perspective of the child: that that child, under the present and foreseeable circumstances, will need to maximize his or her opportunities for a successful life, even if such an approach is to the detriment of individuals who occupy the status of natural parents." Weston, Putative Fathers' Rights to Custody  A Rocky Road at Best, 10 Whittier L. Rev. 683, 700 (1989).
The testimony in this case came from the principals, members of the extended family, counselors, and experts. As to practically all of the most relevant factors there was conflicting, but substantial competent, evidence which supported the trial court's conclusions.
Although D.B.S. does not live in a traditional family unit, the structure in which he lives is stable and caring, and provides for all his physical and psychological needs.
Some evidence tended to show resolution of his parentage would reduce D.B.S.'s confusion and be helpful to him, but this was countered with more compelling testimony that the issue of who is D.B.S.'s biological father is utterly unimportant to him.
The principal fear for D.B.S.'s welfare among those testifying was that his relationships with M.S. and his family, which are currently close and stable, might be severed by the actions of P.S. A second concern was that D.B.S.'s close relationship with his brother, who would continue to reside with M.S., would be disturbed if D.B.S. is determined to be G.F.'s child and M.S. loses all parental rights. There was evidence that P.S. has difficulty respecting the parental rights M.S. currently has and has a great deal of hostility toward him in general.
*459 There was evidence that whatever the relationships among P.S., M.S., and G.F., D.B.S. is currently happy and well adjusted. He has had the financial and emotional support of M.S. and has developed a relationship with G.F.
The trial court specified negatives as to G.F. and P.S., which weighed upon its decision. G.F. had almost no contact with D.B.S. during the first four years of his life and did not assert paternity until some seven years after his birth. As to P.S., the trial court specifically found:
"I find that the position of [P.S.] on this Petition for Paternity is motivated not only as a bargaining chip but to provide her with the clear means to obtain the full custody and control of [D.B.S.] ... I am persuaded that [P.S.] has had a powerful influence on [G.F.] concerning his desire to go forward on this paternity action at this time."
There was no evidence the ordering of blood testing was necessary for medical reasons, and G.F. specifically agreed to share his medical history regardless of whether a blood test was ordered.
There are many additional facts and findings by the trial court which could be enumerated to substantiate its conclusions, but we are at this point "carrying coals to Newcastle" (described in Bartlett's Familiar Quotations p. a120 [14th Ed. 1968], as being "[a]s crazy as hauling timber into the woods").
In this case, the child's present relationships are healthy and stable, the child is unconcerned with his parentage, and a blood test would threaten relationships which have supported the child from birth and promise to support him in the future. The movant's motives are suspect, there are no health or financial benefits, and there is a plethora of substantial competent evidence to sustain the trial court's decision. The decision rendered was not an abuse of the trial court's discretion. The trial court's decision was clearly in the best interests of D.B.S.
Affirmed.