*In re* DEVON M., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Ras M., Respondent-Appellee).—*In re* DONNELL M., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. J.F., Respondent).—*In re* C.P., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Leslie P., Respondent).

First District (1st Division)   Nos. 1—02—0138, 1—02—0897, 1—02—1271 cons.

Opinion filed November 24, 2003.

504

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Lisa D. Huge, of counsel), for appellants.

Richard A. Devine, State's Attorney (Renee Goldfarb, Kenneth T. McCurry, and Nancy Grauer Kisicki, Assistant State's Attorneys, of counsel), and Rhonda L. Casady, both of Chicago, for the People.

JUSTICE McNULTY delivered the opinion of the court:

These three consolidated cases compel us to interpret section 11(a) of the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/11(a) (West 2000)). That section gives the trial court authority to enter a finding of paternity as a sanction if the alleged father refuses to submit to a blood test to determine paternity, but only "if the rights of others and the interests of justice so require." 750 ILCS 45/11(a) (West 2000).

The trial court in all three of the consolidated cases entered findings of paternity as sanctions for refusal to comply with court orders for testing. Both parties in two of the cases ask us to reverse the trial

court's judgment. In the third case those parties seek reversal, but the alleged father, who refused to take the paternity test, asks us to affirm the finding of paternity. Because we find no evidence in the record that the rights of others or the interests of justice require the paternity findings, we reverse the judgments in all three cases.

## BACKGROUND

### *In re Donnell M.*

R.M. gave birth to Donnell M. on October 16, 1996. On September 26, 2000, the Department of Children and Family Services (DCFS) took Donnell into custody. Two days later the Department petitioned for adjudication of wardship pursuant to section 2—3 of the Juvenile Court Act of 1987 (705 ILCS 405/2—3 (West 2000)). DCFS alleged that R.M. left Donnell and his younger sister alone, without an adequate care plan. The petition listed Donnell's father as "UN-KNOWN," but the court ordered K.G., father of some of R.M.'s children, to take a paternity test. After the State's Attorney published notice of proceedings to all unknown persons who might be Donnell's father, the court entered a judgment of default against "unknown fathers."

On November 30, 2000, a caseworker went to R.M.'s home to discuss services and court proceedings. R.M. named R.E. as the father of one of her children, G.H. as the father of another, K.G. as the father of a third, and she could not remember the name of the father of a fourth child. She named J.F. as Donnell's father. DCFS amended its petition for wardship to name J.F. as Donnell's father.

Through diligent searching the caseworker eventually found J.F., and on May 9, 2001, J.F. appeared in court in response to a summons. J.F. said he had never seen Donnell, and he did not know whether Donnell was his child. He admitted that he knew R.M. and he could possibly be Donnell's father. The court ordered him to take a paternity test. The court explained that if the test showed he was Donnell's father, DCFS would investigate him to determine whether he should have custody of Donnell.

When J.F. failed to appear for testing, the State's Attorney petitioned for a finding of contempt. The sheriff could not contact J.F. at the address and telephone number he gave the court.

At a hearing on October 23, 2001, R.M. testified that she believed J.F. was Donnell's father, but she did not know where J.F. lived. A paternity test proved that K.G. was not Donnell's father. The State's Attorney asked for a default finding that J.F. was Donnell's father. The office of the Cook County public guardian (Guardian), appointed to protect Donnell's interests, objected. The court entered a finding of

paternity against J.F., using the remedy available under the Parentage Act. 750 ILCS 45/11(a) (West 2000).

The Guardian moved for reconsideration of the paternity finding. The Guardian argued that no party had filed a proper petition under the Parentage Act and, therefore, the court lacked authority to enter the paternity determination. The Guardian added that the finding would not serve Donnell's interests, as it would foreclose Donnell from seeking a different adjudication of paternity if evidence should come to light showing that a man other than J.F. was his father. The State's Attorney agreed with the Guardian about Donnell's interests and joined in the request to vacate the finding of paternity.

The court found that the petition for adjudication of wardship met the statutory requirement of a petition alleging paternity. The court then asked whether the Guardian sought a body attachment of J.F. so that the court could obtain the tissue samples necessary for a paternity test. The attorney said that the court should either issue such an attachment or find the evidence insufficient for a determination of paternity.

The court noted that the State's Attorney had not succeeded in serving J.F. with summons for the contempt proceedings. The judge said:

> "It seems to this Court that it would be more punitive if this Court were to issue a body attachment which would require that law enforcement officials *** take [J.F.] in custody ***.
>
> *** The Court feels that the Parentage Act allowing the finding of paternity to be entered is a more reasonable exercise of its discretion.
>
> *** [The] Guardian does not have any specific information which would allege that someone other than [J.F.] is the father of the child. Whether or not that would exist would be speculation."

The court denied the motion for reconsideration. The Guardian appeals, and appellee, the State, joins in the request for reversal of the trial court's judgment.

## In re C.P.

Y.D. gave birth to C.P. on February 7, 1996. On July 23, 2001, DCFS petitioned for adjudication of wardship pursuant to section 2—3 of the Juvenile Court Act (705 ILCS 405/2—3 (West 2000)). DCFS alleged that six of Y.D.'s children tested positive for illegal substances at birth, and Y.D. admitted to using illegal substances again while pregnant in 2001. The petition identified C.P.'s father as Leslie P. of unknown address.

In July 2001 Y.D. testified that Leslie P. was C.P.'s father. She named the street where Leslie lived. The court granted temporary custody of C.P. to the guardianship administrator for DCFS.

At a hearing in November 2001, Letaoine P. testified that he did not know whether he was C.P.'s biological father. The court ordered Letaoine to take a paternity test. Nothing in the record on appeal explains the court's treatment of Letaoine P. as though he were the same as Leslie P., but the court so treated him throughout the proceedings. The caseworker named the putative fathers of Y.D.'s other children and explained efforts made to contact those persons. No one appeared for testing to determine the paternity of C.P. Based on the refusal to submit to parentage testing the court named Leslie P. the father of C.P. The Guardian objected that the findings did not serve C.P.'s interests. The court asked whether the Parentage Act required such a finding. The Guardian responded that the evidence did not clearly and convincingly demonstrate paternity. The court held that the refusal to submit to paternity testing proved, clearly and convincingly, that Leslie P. was C.P.'s father. The Guardian appeals and appellee, the State, joins in the request for reversal of the judgment.

### In re Devon M.

E.G. gave birth to Devon M. on July 9, 2001. E.G. died a week later. On July 25, 2001, DCFS took Devon into custody, and two days later DCFS petitioned for adjudication of wardship pursuant to section 2—4(1)(a) of the Juvenile Court Act (705 ILCS 405/2—4(1)(a) (West 2000)), because Devon had no parent, guardian or legal custodian. The petition, which listed Ras M. as Devon's father, alleged that Devon needed a blood transfusion.

Ras sought the aid of the public defender's office. He swore in an affidavit that he was unemployed, with neither income nor assets. He owned no car. The court appointed the public defender to represent Ras. Ras testified that he was sure he was Devon's father. But M.G., E.G.'s uncle, testified that he spoke with Ras at E.G.'s funeral, and Ras then told M.G. he thought the baby was not his. The court ordered Ras to submit to a paternity test.

Although Ras did not object to the order for paternity testing, he never appeared for the test. The Guardian moved to strike Ras's name from the petition for adjudication of wardship. The court found that Ras's testimony in court, and his refusal to submit to the test, proved clearly and convincingly that he was Devon's father. The Guardian appeals and the State joins in the request for reversal of the judgment. Ras submitted a brief on appeal asking this court to affirm the trial court's judgment naming him as Devon's father.

### ANALYSIS

### Jurisdiction

The Guardian contends that Supreme Court Rules 301 and 303

give this court jurisdiction to consider these appeals. 155 Ill. 2d Rs. 301, 303. Those rules allow appeals only from judgments that terminate the litigation between all parties on the merits or dispose of the rights of all parties in the entire controversy. *Peter Fischer Import Motors, Inc. v. Buckley*, 121 Ill. App. 3d 906, 909 (1984). In all three of these cases the Department sued for an adjudication of wardship. The records in the three cases show no final dispositions of those petitions. Without such final dispositions Rules 301 and 303 cannot confer jurisdiction on this court.

■ Instead we find that Rule 304(b)(1) gives this court jurisdiction over the appeals. That rule provides that an "order entered in *** [a] guardianship[ ] or similar proceeding which finally determines a right or status of a party" is immediately appealable without any special finding from the trial court regarding appealability. 155 Ill. 2d R. 304(b)(1). The order appealed in Donnell's case finally determined J.F.'s status as Donnell's father, and J.F. was therefore a party to the case. The order appealed in C.P.'s case finally determined Leslie P.'s status as C.P.'s father, and the order appealed in Devon's case finally determined Ras's status as Devon's father. All of the orders arose in guardianship proceedings. Accordingly, we have jurisdiction to consider these appeals.

## Sufficiency of the Petitions

■ The Guardian claims that the trial court lacked authority to enter the paternity findings because no one filed a paternity petition as required by the Parentage Act. That act provides:

"An action to determine the existence of the father and child relationship *** may be brought by the child; the mother; a pregnant woman; any person or public agency who has custody of, or is providing or has provided financial support to, the child; the Illinois Department of Public Aid if it is providing or has provided financial support to the child or if it is assisting with child support collection services; or a man presumed or alleging himself to be the father of the child or expected child. The complaint shall be verified and shall name the person or persons alleged to be the father of the child." 750 ILCS 45/7(a) (West 2000).

■ The Department had custody of Donnell and Devon when it filed the petitions in their cases, and the Department took custody of C.P., and began providing for his support, shortly after filing the petition. Therefore, the Parentage Act authorized the Department to bring actions to determine parentage.

The Guardian claims that the Department filed a petition, not a complaint as required by the Parentage Act, and the petition did not initiate an action to determine paternity because the Department did

not specifically request that relief. Each of the three cases on appeal began with a verified petition for adjudication of wardship. The petitions (after amendment in Donnell's case) named the alleged fathers. The petition in each case, the first pleading, stated the facts for the cause of action, framed the issues and requested the relief the petitioners sought. Thus, the petition in each case qualified as a complaint. See 735 ILCS 5/2—602 (West 2000); *Kasper v. Frank*, 9 Ill. App. 3d 481, 483 (1972).

DCFS prayed for adjudication of the minors as wards of the court and added a general prayer for "such orders as are in the best interests of the minor, and other relief under the Juvenile Court Act." In the context of the guardianship proceedings we find the general prayer sufficient to invoke the court's power to declare paternity of the minor. See *Heritage Standard Bank & Trust Co. v. Heritage Standard Bank & Trust Co.*, 149 Ill. App. 3d 563, 568 (1986). The petitions met the statutory criteria for initiating paternity determinations. We find that the trial court had authority to enter the orders regarding paternity of the three minors here.

## Paternity Findings

■ The trial court found that section 11(a) of the Parentage Act (750 ILCS 45/11(a) (West 2000)) authorized a finding of paternity as a sanction against the alleged fathers who refused to submit to paternity tests. Section 11(a) provides:

"[T]he court *** may, and upon request of a party shall, order or direct the mother, child and alleged father to submit to deoxyribonucleic acid (DNA) tests to determine inherited characteristics. If any party refuses to submit to the tests, the court may resolve the question of paternity against that party or enforce its order if the rights of others and the interests of justice so require." 750 ILCS 45/11(a) (West 2000).

The statute authorizes a finding of paternity as a sanction against an alleged father, but it limits that authority to cases in which "the rights of others and the interests of justice *** require" such a finding. The trial court relied on this section as authority for the paternity judgments here, but in no case did the court explain what rights of others or interests of justice required the judgment.

The parties cite several cases reminding the courts that the legislature intended the Parentage Act to protect the interests of the child at issue. *E.g.*, *Klawitter v. Crawford*, 185 Ill. App. 3d 778, 784 (1989); *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991). But the parties cite no case explaining the final sentence of section 11(a), and we found no Illinois cases construing that sentence.

The Parentage Act derives from the Uniform Parentage Act (1973),

9B U.L.A. 377—505 (2001), and a number of states that have adopted forms of the Uniform Parentage Act have also allowed findings of paternity as a sanction in similarly limited circumstances. See Kan. Stat. Ann. § 38—1118(a) (2002); N.D. Cent. Code § 14—17—14.1 (2003); see also Uniform Parentage Act (2000) § 622, 9B U.L.A. 347 (2001). Cases in some of these jurisdictions have elucidated the considerations mandated by their statutes. Because Illinois adopted a version of the uniform act, these cases from other jurisdictions provide especially useful guidance for interpretation of our statute. *People ex rel. LeGout v. Decker*, 146 Ill. 2d 389, 397 (1992).

The Supreme Court of Washington, interpreting the Uniform Parentage Act, held:

> "It may be true that a child's interests are generally served by ac-curate, as opposed to inaccurate or stipulated, paternity determina-tions. [Citation.] However, it is possible that in some circumstances a child's interests will be even better served by no paternity determination at all. [Citation.] The best interests of the child standard does not entitle a court to presume that paternity determination is automatically in the child's best interest. ***
>
> *** The child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his or her parents. [Citations.] The putative parent has an inter-est in family bonds and in not being erroneously required to pay child support. [Citations.] The parent also has a recognized right to the companionship, care, and custody of his or her minor children of which he or she cannot be deprived without due process of law. [Citation.] Finally, the State has an interest in protecting the public from the burden of supporting children born out of wedlock and in accurately determining who should pay support. [Citations.] Where these rights come into conflict, the rights of the child should prevail. ***

> * * *

> *** In determining whether it is in the child's best interests to allow a paternity action by one outside the present family, the trial court should consider the stability of the present home environ-ment, the existence or lack thereof of an ongoing family unit, the extent to which uncertainty of parentage already exists in the child's mind, and any other factors which may be relevant in as-sessing the potential benefit or detriment to the child." (Emphasis omitted.) *McDaniels v. Carlson*, 108 Wash. 2d 299, 310-13, 738 P.2d 254, 261-62 (1987).

A Kansas court added that for paternity determinations, the court should consider

> "such factors as the rights and relationships the child has through

the presumed father that might be lost by a determination of parentage, the willingness of the biological father to assume the responsibilities of parentage, and whether there is a compelling medical need to determine paternity. *** The court can also consider the child's basic interest in simply knowing who his or her biological father is." *In re D.B.S.*, 20 Kan. App. 2d 438, 457, 888 P.2d 875, 887, *aff'd sub nom. D.B.S. v. M.S.*, 258 Kan. 396, 903 P.2d 1345 (1995).

In *Throndset v. J.R.*, 302 N.W.2d 769 (N.D. 1981), the trial court entered a default judgment declaring J.R. to be the father of A.B.S. and ordering J.R. to pay child support. The court later denied J.R.'s motion to vacate the default order. The appellate court said:

"Paternity may be denied by the putative father or a man determined to be the father after judicial proceedings. That denial may well have a more detrimental effect on a child when the judicial proceedings have culminated in a default judgment which the court has refused to vacate upon the request of a man who wishes to have blood tests taken to determine his parenthood and who seemingly questions whether or not he is the actual father of the child. ***

*** [T]he plaintiffs were concerned primarily with the immediate support of [A.B.S.] and perhaps not so much with the effect this determination may have on [A.B.S.] as she matures into an adult. We therefore believe it is preferable that the matter of [J.R.'s] paternity of [A.B.S.] be determined in a judicial proceeding rather than by default judgment so that this cloud at least will be removed from [A.B.S.'s] birth record and from her future." *Throndset*, 302 N.W.2d at 774.

■ Here, the determinations of paternity appear to serve none of the minors' interests. The minors have no ties to their alleged fathers. Their family situations do not involve their alleged fathers. The records in the cases of C.P. and Donnell give no indication that the alleged fathers have any ability to support the minors or any inclination to establish paternal relationships with the minors. For Devon, the record includes his alleged father's affidavit, showing no employment, no income, and no assets. Shortly after his birth Devon had a compelling medical need for a blood transfusion. Insofar as the medical need may have provided grounds for a determination of paternity, it demanded an accurate determination of biological paternity established by appropriate tests, not a default finding made without such scientific evidence.

The determinations here identify the father of each child as a man who at some time questioned the alleged paternity, and each determination leaves the question of biological paternity unresolved.

As the North Dakota court pointed out, the continuing uncertainty of having such a man labeled as a father by the court without appropriate testing can have a decidedly detrimental effect on the child.

Moreover, the Public Guardian and the State's Attorney have both shown that a very substantial detriment to each child may result from these determinations. Because the Guardian represented each child's interests in the proceedings here, the paternity finding will estop each child from relitigating paternity, even if new evidence comes to light conclusively establishing that another man (perhaps with garnishable income or attachable assets) is the child's father. *In re Parentage of Griesmeyer*, 302 Ill. App. 3d 905, 915 (1998). The evidence of multiple fathers for the children of Y.D. and R.M. at least suggests the possibility that some men other than J.F. and Leslie P. may be the fathers of Donnell and C.P.

Ras M., who alone argued in support of the trial court's paternity determinations, has shown some interest in acting as Devon's father. We welcome him to comply with the trial court's order to take a DNA test to determine whether he is Devon's biological father, and we welcome him to assume his paternal duties to the best of his abilities should the test prove him the father. We agree with the State's Attorney that the parties should continue to send him notice of all proceedings concerning Devon's guardianship. Also, J.F. and Leslie P. (perhaps along with Letaoine P.) should receive notice of all guardianship proceedings concerning Donnell and C.P., respectively. The trial court has the power to terminate their parental rights without a binding judicial determination of whether Ras M., J.F. and Leslie P. are the fathers of Devon, Donnell and C.P. See *In re A.S.B.*, 293 Ill. App. 3d 836, 844 (1997).

The records in these three cases show no interests served by the findings entered as sanctions against the alleged fathers who refused to submit to testing. The trial court made no findings of any benefits to follow from the judgments. Because the Parentage Act restricts the court's power to determine paternity as a sanction to those cases in which "the rights of others and the interests of justice *** require" such a finding (750 ILCS 45/11(a) (West 2000)), we hold that the trial court abused its discretion by entering the findings of paternity here. Accordingly, we reverse the judgments of the trial court in the three cases and we remand the three cases for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GORDON and McBRIDE, JJ., concur.