No. 62,522

In the Matter of the Marriage of Sylvia K. Ross, *Appellee*, and Robert Lewis Ross, *Appellant,* and R.A.R., a minor child, by and through his Guardian ad Litem, *Appellee,* v. Charles Allan Austin, *Appellant.*

(783 P.2d 331)

Opinion filed November 29, 1989.

N. *Trip Shawver*, of Wichita, argued the cause and was on the briefs for appellant Robert Lewis Ross.

*Peter C. Hagan*, of Helsel, Hagan & Macias, of Wichita, argued the cause and was on the briefs for appellant Charles Allan Austin.

*Peter John Orsi, II*, of Wichita, argued the cause and was on the brief for appellee Sylvia K. Ross.

*Lois A. Lynn*, guardian ad litem, of Wichita, argued the cause and was on the brief for appellee R.A.R.

The opinion of the court was delivered by

LOCKETT, J.: Robert Lewis Ross and Charles Allan Austin appealed the district court's determination under the Kansas Parentage Act, K.S.A. 38-1110 *et seq.*, that Charles *is* the biological father of R.A.R., a minor child born November 6, 1982, during the marriage of Sylvia K. Ross and Robert. The Court of Appeals affirmed the judgment of the district court, holding that: (1) an evidentiary hearing on the best interests of the child need not precede a paternity determination; (2) the guardian ad litem was not equitably estopped from denying Robert's paternity; (3) the divorce decree did not render the claim of parentage res judicata; (4) the doctrines of equitable adoption, equitable parenthood, and adoption by estoppel are not followed in Kansas; and (5) the district court did not err by admitting blood test evidence pursuant to K.S.A. 38-1118. *In re Marriage of Ross*, 13 Kan. App. 2d 402, 772 P.2d 278 (1989). Robert filed a petition for review, which this court granted.

We agree with holdings (2)-(5) and affirm the Court of Appeals' judgment in that regard, without repeating the bases for those holdings in this opinion. See 13 Kan. App. 2d at 407-10. We reverse with regard to holding (1) and explain our disagreement.

The facts are quoted from the Court of Appeals' opinion in this case:

"In January of 1984, Sylvia sued Robert for divorce, alleging him to be the father of R.A.R. The divorce decree awarded custody of R.A.R. to Sylvia,

granted Robert visitation rights, and ordered payment of child support. Robert subsequently obtained joint custody of R.A.R. in November of 1985.

"In August of 1987, Sylvia, pursuant to the Kansas Parentage Act (K.S.A. 38-1110 *et seq.*), filed a petition alleging Charles is the biological parent of R.A.R. Contemporaneous with this filing, Sylvia asked for the appointment of a guardian ad litem for R.A.R. and requested that all parties be compelled to submit to blood testing. Lois A. Lynn was subsequently appointed guardian ad litem.

"Charles and Robert moved to strike Sylvia's petition on the theory of res judicata and equitable estoppel. In September of 1987, the guardian ad litem filed a separate paternity action on the basis of Sylvia's affidavit and also filed a motion for blood testing.

"On October 19, 1987, the trial court dismissed Sylvia's action but directed the guardian ad litem to proceed. The court, without an evidentiary hearing, sustained the guardian ad litem's motion for blood testing.

"A hearing was held on April 28, 1988, on the guardian ad litem's petition for paternity determination. Charles' motion to dismiss the paternity action for failure of the court to determine the best interests of the child was denied. The trial court stated it had previously been determined it was in R.A.R.'s best interests for his biological father to be determined.

"The trial court limited the testimony to the determination of biological parentage of R.A.R. and would not permit Robert or Charles to introduce evidence relating to R.A.R.'s best interests.

"The results of the blood test were admitted into evidence over Robert's and Charles' objections. Sylvia admitted that near the conception time of R.A.R. she had engaged in sexual intercourse with both Robert and Charles. When R.A.R. was born, Sylvia decided that Robert was the father.

"Sylvia stated she began to suspect Charles was the biological father due to physical characteristics of R.A.R. when he reached the age of three and one-half years. Sylvia then informed both Robert and Charles of the possibility that Charles was the father. Robert continued to care for the child in the joint custody arrangement and paid R.A.R.'s child care expenses.

"Sylvia testified she had asked Charles whether he would be willing to consent to the adoption of R.A.R. by Sylvia's present husband if Charles were determined to be the biological father.

"Charles was determined by clear and convincing evidence to be the biological father of R.A.R. The possibility of Robert being the biological father of R.A.R. was precluded by the blood tests. Sylvia's motion regarding child support, custody, and visitation was continued, with visitation between Robert and R.A.R. ordered to remain unchanged.

"In May of 1988, after hearing statements and arguments from counsel, the court granted Sylvia's motion for child support to be paid by Charles; denied Charles' motion to pay part of the support to Robert; denied Sylvia's motion for cessation of visitation between R.A.R. and Robert; found Robert stands in loco parentis; and maintained the joint custody between Robert and Sylvia over Sylvia's objection." 13 Kan. App. 2d at 403-04.

In its opinion, the Court of Appeals quoted the relevant provisions of the Kansas Parentage Act.

K.S.A. 38-1115 provides:

"(a) A child whose paternity has not been determined, or any person on behalf of such a child, may bring an action:

"(1) At any time to determine the existence of a father and child relationship presumed under K.S.A. 38-1114 or

"(2) at any time until three years after the child reaches the age of majority to determine the existence of a father and child relationship which is not presumed under K.S.A. 38-1114."

K.S.A. 38-1114 provides:

"**Presumption of paternity.** (a) A man is presumed to be the father of a child if:

"(1) He and the child's mother are, or have been, married to each other and the child is born during the marriage . . . .

. . . .

"(b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man."

When construing the Act, we recognize that it is the intent of the legislature that governs; the court must give effect to the legislature's intent even though words, phrases or clauses at some place in the statute must be omitted or inserted. In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987).

The Kansas Parentage Act sets out numerous presumptions of paternity which apply to Robert. The child was born during the

marriage; Robert had acknowledged his paternity of the child in writing; with his consent, he was named as the father on the child's birth certificate; he willingly became obligated to support the child in the divorce decree; and he notoriously and in writing recognized his paternity of the child to the district court. K.S.A. 38-1114. There was little else Robert could have done to acknowledge to the rest of the world that he was the father of the child and that he was willing to support the child.

The stated purpose of the Act is to ensure that the legal obligations, rights, privileges, duties, and obligations incident to the mother/child relationship and the father/child relationship are carried out. K.S.A. 38-1111. To insure that the child's interests are protected, K.S.A. 38-1125(b) indicates when a guardian ad litem shall be appointed.

The trial court did not hold a full evidentiary hearing nor did the appointed guardian ad litem conduct an investigation to determine whether there was any reason for the court to determine the biological father. The guardian ad litem's petition merely stated: (1) there had been a verified petition filed to establish paternity of the minor child because the mother had had sexual intercourse with two men near the time of conception; (2) there has never been a determination of paternity, merely a presumption that can be rebutted by clear and convincing evidence; and (3) it is therefore in the best interests of the child to have paternity finally determined.

The Court of Appeals found that R.A.R.'s interests had been properly represented by the guardian ad litem and that the district court was not required to consider the best interests of the child until the biological father had been determined. The court noted that 38-1125(b) merely states when a guardian ad litem is to be appointed and that the only reference in the Act to the best interests of the child appears in K.S.A. 1988 Supp. 38-1121(c), which requires a court to consider a child's best interests when entering orders regarding custody and visitation.

Prior to legislative action, Kansas followed the Lord Mansfield Rule. The rule was discussed by this court in *Stillie v. Stillie,* 129 Kan. 19, 281 Pac. 925 (1929), *aff'd on reh.,* 130 Kan. 299, 286 Pac. 394 (1930). Though modified, the rule has never been explicitly overruled. The rule provides:

" 'The law of England is clear, that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage. . . . It is a rule, founded in decency, morality, and policy, that they shall not be permitted to say after marriage, that they have had no connection, and therefore that the offspring is spurious; more especially the mother, who is the offending party.' " 129 Kan. at 22 (quoting *Goodright ex dim. Stevens v. Moss et al.*, 2 Cowper's Reports 591, 592-94 [1777]).

In *Bariuan v. Bariuan*, 186 Kan. 605, 352 P.2d 29 (1960), we acknowledged that the ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law. To prevent substantial injustice, that presumption had been weakened by this court when it allowed either the wife or the husband to testify as to nonaccess of the husband during the time of conception . *Lynch v. Rosenberger*, 121 Kan. 601, 249 Pac. 682 (1926).

The Uniform Parentage Act, which Kansas substantially adopted, was approved by the National Conference of Commissioners on Uniform State Laws in 1973. The Conference explained the need for uniformity in this area as follows:

"When work on this Act began, the notion of substantive legal equality of children regardless of the marital status of their parents seemed revolutionary if one considered existing state law on this subject. [Citation omitted.] Even though the Conference had put itself on record in favor of equal rights of support and inheritance in the Paternity Act and the Probate Code, the law of many states continued to differentiate very significantly in the legal treatment of legitimate and illegitimate children.

"This Act is promulgated at a time when the states need new legislation on this subject because the bulk of current law on the subject of children born out of wedlock is either unconstitutional or subject to grave constitutional doubt.

"Since 1968, a series of decisions rendered by the United States Supreme Court under the Equal Protection Clause of the 14th Amendment of the U.S. Constitution has mandated equal legal treatment of legitimate and illegitimate children in a broad range of substantive areas, one exception being the right of intestate succession. [See *Gomez v. Perez*, 409 U.S. 535, 35 L. Ed. 2d 56, 93 S. Ct. 872 (1973); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 31 L. Ed. 2d 768, 92 S. Ct. 1400 (1972)].

. . . .

"Accordingly, in providing substantive legal equality for all children regardless of the marital status of their parents, the present Act merely fulfills the mandate of the Constitution. With the exception of the child's right to inherit from his intestate father, which a growing number of states has provided without constitutional compulsion, the equal treatment provided

by the Act is not the Conference's 'wishful thinking.' It is the law of the land." 9B U.L.A. 288-89 (1987).

The Court of Appeals correctly construed the Kansas Parentage Act to provide that every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his parentage. 13 Kan. App. 2d at 407. In this case, however, R.A.R. was receiving support from Robert, his presumed father, prior to the filing of the action. The child had the statutory right to inherit from Robert. If Charles is determined to be R.A.R.'s biological father, there is no absolute right of inheritance because, although statutory law distributes the father's estate if the father dies without having drawn a will, Charles can simply will his property to others. While family bonds had been established between R.A.R. and Robert, Charles was unwilling to assume the responsibilities of a parent. At the time the petition was filed, there was no compelling medical need to determine the biological father. And most important, the action was brought by the mother to use as a bargaining chip against Charles, the suspected biological father, to further her plan to have the child adopted by her present husband. The bastardization of R.A.R. achieves none of the purposes of the Act.

The Uniform Parentage Act clearly was designed to provide for the equal, beneficial treatment of children. In this regard, it requires courts to act in the best interests of the child when imposing legal obligations or conferring legal rights on the mother/child relationship and the father/child relationship.

We disagree with the Court of Appeals' conclusion that the mother's original petition was sufficient for the guardian ad litem to request that the child's biological father be determined. Nor do we believe that the guardian ad litem properly represented the interests of the child by deciding not to conduct an investigation and by concluding from the mother's petition that a child, who had only a presumed father, must have its biological father scientifically determined by a blood test. The duty of the guardian ad litem is to make an independent investigation of the facts upon which the paternity petition is based and then to appear and represent the best interests of the child at the hearing.

Robert claims it was an abuse of discretion for the trial judge to reason that, in every paternity case, it is in the best interests

of the child to have his or her biological father determined. The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision. *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988).

Robert argues that the Court of Appeals' approval of the trial judge's "bright line rule" will prove harmful to the stability of the parentage already existing. Robert argues it is necessary to conduct an evidentiary hearing to determine the best interests of children prior to proceeding further under the Act. In support of this contention, Robert cites *McDaniels v. Carlson*, 108 Wash. 2d 299, 738 P.2d 254 (1987). In that case, the Washington court said:

"[T]he mere filing of a paternity action does not automatically imply that the action is in the child's best interest. A court must reach this conclusion independently based on the facts in the record and the recommendations of the guardian ad litem appointed to represent the interests of the child." 108 Wash. 2d at 313.

As for Robert's claim that an evidentiary hearing should always precede such a determination, the Court of Appeals said: "We do not believe that appellate courts should attempt to set down a bright line rule as to how the trial court must proceed in actions under the Kansas Parentage Act . . . . Such matters are best left to the sound discretion of the trial court." 13 Kan. App. 2d at 407.

As authority for its decision not to require a hearing on the best interests of the child prior to determining the biological father, the Court of Appeals cites our decision in *In re Marriage of Zodrow*, 240 Kan. 65, 727 P.2d 435 (1986). Its reliance on *Zodrow* is misplaced. There, two children were born during the marriage. After marital trouble developed, the wife filed for divorce, alleging that the two children were born of the marriage. In an uncontested hearing, the district court found that the minor children were born of the marriage and awarded custody of the children to the mother. Approximately six months later, the father filed a motion to modify his visitation rights. After a full evidentiary hearing, the district judge enlarged the father's visitation

rights. Up to this point, the ex-wife had never claimed that her ex-husband was not the biological father of the children.

Three months later, the ex-wife filed a motion to modify the decree of divorce, alleging it had come to her attention that her ex-husband was not the biological father of the younger child born during the marriage and requesting a blood test to determine the biological father. She subsequently amended her motion by stating that the actual (but unnamed) father of the child had expressed his desire to support and parent the child. At the hearing on the motion, the ex-wife stated that the child was conceived in an extramarital affair with her ex-husband's first cousin, who was also his business partner and now her husband. The record contained a later report from the Midwest Organ Bank, stating that, based upon blood tests of the mother, the child, and the ex-husband's cousin, it was "678 times more likely" that the cousin was the biological father "than a random, unrelated Caucasian man." The ex-husband adamantly claimed that he was the biological father of the child and that he cared for the child and wanted to support the child. The district court denied the K.S.A. 60-260(b) motion to modify the divorce decree, finding: (1) the ex-wife was playing games with the court; (2) it was not in the best interests of the child to grant the motion; and (3) even if the presumed father submitted to a blood test, whatever the outcome, it would not be persuasive to set aside the prior judgment. The court refused to require the ex-husband to submit to a blood test and the ex-wife appealed.

In an unpublished opinion filed April 10, 1986, the Court of Appeals considered *Besse v. Besse*, 1 Kan. App. 2d 217, 563 P.2d 518, *rev. denied* 221 Kan. 757 (1977). In *Besse*, the parties married before the child was born and they knew that the husband was not the biological father. Approximately four years later, the parties divorced. Both the petition for divorce and the consent decree stated that the husband was the father of the child. One year later the ex-husband quit paying child support and filed a motion to correct the journal entry to show that he was not the biological father of the child. The ex-wife filed a motion for summary judgment, which was granted by the district court. The Court of Appeals held that the trial court had not abused its discretion, but noted that, six months after the district judge's

decision and while the case was pending on appeal, another man had filed an action asking to relieve the ex-husband of the duty to pay child support and for a finding that he was the biological father of the child. Based on the subsequent occurrences, the case was remanded to the district court for a full evidentiary hearing.

In *Zodrow*, 240 Kan. 65, the Court of Appeals noted the Kansas Parentage Act gives a district court jurisdiction to join an action to determine parentage with an action for divorce, annulment, separate maintenance, support, or adoption, and provides a vehicle by which the presumption of paternity may be rebutted by clear and convincing evidence. The Court of Appeals applied *Besse* to the facts in *Zodrow* and remanded the case to the district court with instructions to proceed with proper joinder of parties, appointment of a guardian ad litem, a blood test as required by K.S.A. 1985 Supp. 38-1117 and 38-1118, and final adjudication under the Act.

We accepted the *Zodrow* petition for review and reversed the Court of Appeals, holding that the trial court's finding continued a relationship that otherwise might be severed. We approved the trial court's concern as to what effect an amendment to the divorce decree would have on both children, *i.e*, whether it was in the best interests of the children to maintain the status quo. Our emphasis in *Zodrow* was clearly on protecting the best interests of the children involved.

The Act provides: "The court shall enter such orders regarding custody and visitation as the court considers to be in the best interest of the child." K.S.A. 38-1121(c). On this point, the Court of Appeals said: "If . . . the alleged father is determined to be the biological father, as in the case within, the court may still hear and consider evidence as to the best interests of the child in determining custody, visitation, and child support." 13 Kan. App. 2d at 407.

The Court of Appeals was correct when it stated that "[t]he guiding principle of the Kansas Parentage Act is to provide substantive legal equality for all children regardless of the marital status of the parents. Pejorative adjectives such as 'legitimate,' 'illegitimate,' or 'bastard' have been eliminated as inconsistent with this goal." 13 Kan. App. 2d at 409.

We do not agree with the Court of Appeals' conclusion that a trial court, faced with a valid request for the determination of parentage, may logically reason that, if blood testing proves the presumed father to be the biological father, the issue of parentage is closed and the necessity for extended evidence as to the child's best interests is precluded. If, however, the alleged father is determined to be the biological father, as in this case, the court may still hear and consider evidence as to the best interests of the child in determining custody, visitation, and support. Though such reasoning promotes judicial economy, it is contrary to our longstanding public policy that a child born during a marriage should not be bastardized.

The present case is a vivid example of what can occur when a court, in the pursuit of judicial economy, bastardizes a child and then determines that because of bonding it is in the child's best interests to continue his or her relationship with the presumed father. The court has not only bastardized the child and relieved the presumed father of all necessity of support, but it has placed the obligation to support the child on the biological father, who has never had a bonding relationship with the child. Such is not the purpose of the Act or our public policy. Once the judge, in the interest of judicial economy, ruptures the father/child relationship, the judge cannot return the parties to the position they were in prior to the blood test, no matter how wise or great his or her judicial power. That is a fact of life.

A child's psychological tie to a parent is not a simple, uncomplicated relationship. A child requires from his parents not only bodily comfort and gratification, but also demands affection, companionship, and stimulating intimacy. Where these needs are answered reliably and regularly by the parent, the child-parent relationship becomes firm, with immensely productive effects on the child's intellectual and social development. Where there are changes of the parent figure or other hurtful interruptions, the child's vulnerability and the fragility of the relationship become evident. See generally Goldstein, Freud, & Solnit, Beyond the Best Interests of the Child 17-20 (1973); Goldstein, Freud, & Solnit, Before the Best Interests of the Child (1979).

So long as a child is part of a viable family, the child's own interests are merged with those of the other family members.

After the family unit fails to function because of legal dissolution, the child's interests become a matter for the State's intrusion. The child is placed in jeopardy whenever a parent's claim for the child is based solely or predominantly on motives to score over a warring partner after divorce by replacing the legally presumed father with the biological father. See generally Goldstein, Freud, & Solnit, Beyond the Best Interests of the Child 17-20; Goldstein, Freud, & Solnit, Before the Best Interests of the Child.

When a marital relationship has been terminated, children of the marriage need for the court to provide stability in their lives, to acknowledge that their perception of time is different from that of an adult, and to take into consideration their past relationship with their parents. Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child, including physical, mental, and emotional needs. The shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child. Although someone may suffer, it should never be the child, who is totally innocent and who has no control over or conception of the environment into which he or she has been placed. *In re Marriage of Ross*, 13 Kan. App. 2d 402, 772 P.2d 288 (1989).

Under the facts of this case, the district judge abused his discretion. The mere filing of a paternity action does not automatically imply that the action is in the child's best interests. A court must reach this conclusion independently based on the facts in the record. *McDaniels v. Carlson*, 108 Wash. 2d at 313. We realize, of course, that Charles' paternity has been determined and cannot be undone; however, our decision in this case will have meaningful application to similar cases in the future.

The district court's order requiring the parties to submit to blood tests is reversed. The district court's determination that Charles is the biological father of R.A.R. is also reversed. While we realize that blood tests have already been performed in this case, the court shall not consider the results of the tests until such consideration is determined to be in R.A.R.'s best interests. Finally, the district court's order requiring Charles to pay child support is reversed. The orders regarding support, visitation, and

custody that were in effect prior to the filing of the petition alleging Charles to be R.A.R.'s biological father are reinstated.

The judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. The judgment of the district court is reversed and the case is remanded.

SIX, J., not participating.