No. 87,999

In the Matter of the Marriage of RICK D. PHILLIPS, *Appellee,* and CAROL LYNN PHILLIPS, *Appellant.*

(58 P.3d 680)

Opinion filed December 6, 2002.

*Mark A. Corder,* of Mark A. Corder, P.A., of Olathe, was on the brief for appellant.

*Joyce Hendrix-Kuchar,* of Bezek, Lowry & Hendrix, of Ottawa, was on the brief for appellee.

*Mark Doty,* of Gleason & Doty, Chartered, of Ottawa, guardian ad litem.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by Carol Lynn Phillips from the district court order that her former husband Rick D. Phillips and she would have joint custody of the two minor children, with Rick having primary residential custody. Carol's appeal is based principally on the ground that Rick is not the biological father of the children. An appellee's brief was filed by the guardian ad litem requesting that the district court's decision be affirmed. The case was transferred from the Court of Appeals by this court. K.S.A. 20-3018(c).

The sole issue before this court on appeal is whether the district court erred in ordering joint custody of the children with the father having primary residential custody.

The district court made the following findings of fact with regard to the issues of paternity and custody. The parties do not challenge the findings of fact made by the district court, and they are therefore conclusive for purposes of this appeal. *State ex rel. Board of Healing Arts v. Beyrle*, 269 Kan. 616, 618, 7 P.3d 1194 (2000).

### Paternity

"1. Rick . . . and Carol . . . were married February 14, 1987.

"2. Two children were born of the marriage, namely [ J.D.], date of birth February 25, 1990, and [J.N.], date of birth June 2, 1992. Rick is shown as the father on the birth certificates of both children . . . .

"3. Rick acknowledged paternity of the children by verified Petition of Divorce filed June 7, 2000.

"4. [J.D.] and [J.N.] have only known Rick as their father and Carol as their mother throughout their lives.

"5. No other person besides Rick has had a father-child relationship with [J.D.] or [J.N.] and there is no father who has provided financial, emotional or legal support for [J.D.] or [J.N.] other than Rick. Rick is known as the father of [J.D.] and [J.N.] by their school staff, their doctor, and their friends and family.

"6. There is no other pending litigation concerning the custody of [J.D.] or [J.N.] in this or any other jurisdiction.

"7. There is no person or entity who is claiming rights of custody or visitation with [J.D.] or [J.N.] other than Rick and Carol.

"8. Rick is not the biological father of [J.D.] or [J.N.]. This was confirmed through genetic testing which Rick requested after [J.N.]'s birth.

"9. Carol testified that the two children were conceived through artificial insemination using sperm from a known donor other than Rick.

"10. After the genetic testing was completed, Rick sought advice from an attorney, and was advised that it was unnecessary for Rick to initiate an adoption or paternity action to assert legal rights to the children, since they were born of the marriage.

"11. No written consent to the artificial insemination process was ever presented to Rick.

"12. Carol testified that both children were conceived through an artificial insemination procedure, and that the donor of the semen for both procedures was a Steve Triple, from Minnesota. She testified that the procedure was con-

ducted at the K.C. Reproductive Center, and that a John Beth was the physician supervising the procedures. Carol now claims that the K.C. Reproductive Center is no longer in business; that Dr. Beth is deceased; and that the records of the procedures were destroyed in a cave fire.

"13. Jane Collins, a mutual friend of Rick and Carol's, testified that Carol told her that she had told Rick that the children were conceived through artificial insemination, but that this was not true. Carol told Jane Collins that she, 'had them with some guy in Minnesota.' The Court, in observing Carol's demeanor during the testimony of Jane Collins, noticed that Carol was smiling and laughing.

"14. Although genetic testing has confirmed that Rick is not the biological father of the children, there is no presumption of anyone else's paternity.

"15. Petitioner's Exhibits 3 and 4 exclude Rick as the biological father, but seem to suggest that the biological father of [J.D.] and [J.N.] are two different persons, not one person as testified to by Carol."

The trial court made the following conclusions of law with regard to the issue of paternity:

"16. Considering all of the evidence presented concerning the issue of paternity, and having observed Carol's demeanor during the course of the trial, the Court finds that Carol's testimony lacks credibility on this issue.

"17. Rick Phillips is presumed to be the father of [J.D.] and [J.N.] pursuant to K.S.A. 38-1114(a)(1).

"18. A presumption under K.S.A. 38-1114 may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man, or if two or more conflictng presumptions arise which the Court shall resolve. If a presumption is rebutted, the party alleging the existence of a father-child relationship shall have the burden of going forward with the evidence.

"19. Carol has not rebutted the presumption of Rick's paternity by clear and convincing evidence, there is no court decree establishing paternity of the children by another man, there are no conflicting presumptions under the statute, and Carol has failed to meet her burden of going forth with the evidence concerning this issue.

"20. K.S.A. 38-1114(f) provides that the donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife, is treated in law as if he were not the birth father of the child thereby conceived, unless agreed to in writing by the donor and the woman. Carol presented no evidence that she and Steve Triple had an agreement in writing that he would have any legal rights to [J.D.] or [J.N.]. Carol argues that this section of the statute, although perhaps precluding Mr. Triple's paternity, does not establish Rick's paternity. Rick's paternity, however, is established pursuant to K.S.A. 38-1114(a)(1).

"21. It is not in the best interest of [J.D.] or [J.N.] to order paternity testing of Steve Triple or to join him as a party in this proceeding, pursuant to *In re Ross*, 245 Kan. 591 (1989).

"IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Rick D. Phillips is the father of [J.D.] date of birth February 25, 1990, and the father of [J.N.] date of birth June 2, 1992."

## Custody

"Rick is requesting sole custody of [J.D.] and [J.N.]. Carol is requesting sole custody under the theory that Rick has no legal rights to the children. The Court has determined that Rick is the legal father of the children. The Court having considered the evidence and the papers and pleadings filed concerning the issue of custody, makes the following findings and orders:

"1. Dr. John V. Spiridigliozzi conducted a thorough child custody evaluation pursuant to an Agreed Order for Custody Evaluation filed August 16, 2000.

"2. The Court finds that the child custody evaluation of Dr. Spiridigliozzi which was agreed to by the parties, was a valid and appropriate evaluation and study. Dr. Spiridigliozzi's findings are incorporated by reference as though set forth fully herein.

"3. Dr. Spiridigliozzi concluded that the children's best interests will be served if Rick maintains primary physical custody of them. Mark Doty, the attorney guardian ad litem appointed by the Court, recommended that Rick have sole custody of the children.

"4. George A. Harris, a Ph.D. psychologist (not licensed in Kansas) retained by Carol, testified and submitted a confidential psychological report in which he criticized Dr. Spiridigliozzi's interpretation of the MMPI raw data. Dr. Harris further opined that Dr. Spiridigliozzi had not dealt adequately with the issue that Rick is not the children's biological father.

"5. Dr. Harris' summary at page 9 of his report, implies that Carol should have primary residence of the children, and characterizes the current custodial arrangement as, 'a strange set of facts.'

"6. Both before and during the litigation concerning this issue, Carol has engaged in bizarre conduct.

"7. Carol gave the children a camera, instructed them to take a bath together at Rick's residence and to take pictures which she could use against Rick.

"8. Carol submitted to Dr. Spiridigliozzi for his consideration in the custody determination a three (3) page letter purportedly authored by Kenneth R. Holladay, the children's family physician, which describes in glowing terms Carol's suitability as a parent and recommends that [J.D.] and [J.N.] return to Carol's 'happy loving environment.' When shown the letter . . . Dr. Holladay denied knowledge of any of the contents of the letter and stated unequivocally that the letter was not signed by him.

"9. The parties stipulated to the testimony of Det. Harold W. Hughes from the Crimes Against Property Unit of the Johnson County Sheriff's Office. Det.

Hughes investigated a burglary reported by Carol at her Desoto residence. Carol told Det. Hughes that [J.D.] and [J.N.] had noticed that Rick's gloves were outside an open window to the residence along with an empty bottle of beer which they recognized as Rick's brand. Det. Hughes investigated her claim and concluded that the gloves in question were both right handed; that a knife which Carol claimed was stuck in a picture of her and one of the children, had been stuck in the picture twice; that based on his examination of the window sill with a finger print brush and observing that dust was still present and undisturbed on the window sills, it was his opinion that no one entered the residence through the window. Det. Hughes concluded that Carol had staged the burglary and confronted her with this fact. She denies that she staged the burglary.

"10. The Court has received several letters from [J.D.] and [J.N.] and after the last evidentiary hearing received computer photographs of Carol and the children engaging in normal happy activities.

"11. The Court finds that throughout this entire matter, Carol has attempted to cast Rick in a negative light, and to manipulate the court proceedings."

## The trial court made the following conclusions of law with regard to the issue of custody:

"12. The key issue concerning custody was aptly expressed by Dr. Spiridigliozzi in the conclusion of his report to the Court, 'the court must weigh the harm inflicted upon the children by Ms. Phillips' efforts to estrange the children from Mr. Phillips versus their need to have a close relationship with their mother.'

"13. In applying the factors under K.S.A. 60-1610 which the Court shall consider:

a) The length of time that the children have been under the actual care and control of any person other than a parent - this factor is not applicable to this case.

b) The desires of the children's parents as to custody or residency. Both parents have the ability to parent their children and desire that residency be placed with them. Rick has qualified his position by stating in the long term he feels that the children would be better off with Carol if she would address her mental and emotional issues. Although Carol is a loving parent, the Court is not totally convinced that her desire for primary residency or sole custody of the children is motivated by her desire to help the children. Rather, Carol seems to be focused on her needs and her desire to hurt Rick. The evidence weighs in Rick's favor as to this factor.

c) The desires of the children as to their custody or residency. Both children express the desire to live with Carol and certainly to spend more time with her. The evidence weighs in favor of Carol as to this factor.

d) The interaction and interrelationship of the children with parents etc. The evidence concerning this factor is that Carol has been the primary caregiver for the children. Therefore the evidence weighs in her favor as to this factor.

e) The children's adjustment to the children's home, school and community. The evidence is that J.D. and J.N. are adjusted to Rick's home, to Carol's home, that they are adjusted to their friends and activities in the Wellsville school district although they have experienced some problems at school. They have never attended school in Desoto, therefore no evidence was presented concerning that school situation. The Court finds that the evidence is about even concerning this factor.

f) The willingness and ability of each parent to respect and appreciate the bond between the children and the other parent and to allow for a continuing relationship between the child and the other parent. Carol has demonstrated neither the willingness nor the ability to appreciate the bond between the children and Rick. Rick has at least expressed the willingness and demonstrated some ability to respect Carol's role as the mother of the children. The evidence weighs in favor of Rick on this factor.

g) Evidence of spousal abuse. The Court finds that this factor is not applicable in this case.

"14. After analyzing the statutory factors as applied to the facts of this case, the Court finds that the statutory preference for joint legal custody should be followed in this case, and that Rick and Carol should have joint legal custody of [J.D.] and [J.N.].

"15. The Court finds that it is in the best interest of [J.D.] and [J.N.] that their primary residence be with their father the petitioner, Rick D. Phillips. Although Carol has been the primary caretaker historically of the children, her persistent and bizarre attempts to alienate the children from Rick are causing damage to the children and need to cease before she can be considered for primary residence.

"16. The Court does find that it is in the best interest of [J.D.] and [J.N.] that Carol's access be expanded from the temporary orders.

"17. Generally speaking, during the school year the children should reside with Rick during the week, and Carol on the weekends."

The district court ordered anger management counseling for Rick and "counseling with a licensed doctoral level psychologist who has experience with persons who have attempted to alienate their children from the other spouse" for Carol. Noting that its orders concerning custody and visitation are subject to reconsideration, the district court stated: "If Carol complies with Court's orders regarding counseling in good faith, the Court may in the future consider changing the primary residence to Carol. If Carol does not comply with the Court's orders with regards to counseling, the Court may in the future consider restricting Carol's access with [J.D.] and [J.N.]."

Carol argues that the district court's custody decision is improper because Rick is not the biological father of the children. The appellee contends that the district court correctly applied Kansas statutes in determining that Rick is the children's father.

Although Carol did not seek judicial determination of paternity under the Kansas Parentage Act, K.S.A. 38-1110 *et seq.*, the Act is necessarily implicated because she challenges the custody order on the grounds that Rick is not the biological father of the children.

The district court cited provisions of the Kansas Parentage Act and *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), in reaching its decision. In *Ross*, this court construed the provisions of the Kansas Parentage Act in rejecting the trial court's determination that Robert Ross was not the biological father of the minor child. Sylvia Ross had been granted a divorce from Robert. In the divorce proceedings she alleged Robert was the father of the children born during the marriage. Almost 2 years later, Sylvia filed a petition under the Parentage Act alleging that Robert was not the biological father of the children. The trial court ordered blood tests, which determined that Charles, not Robert, was the biological father of the children. The trial court found Charles to be the father and ordered that he pay child support and continued the order granting Robert visitation rights with the children. In reversing the trial court which had ordered blood tests without first determining if such tests were in the best interests of the children, we said:

"The present case is a vivid example of what can occur when a court, in the pursuit of judicial economy, bastardizes a child and then determines that because of bonding it is in the child's best interests to continue his or her relationship with the presumed father. The court has not only bastardized the child and relieved the presumed father of all necessity of support, but it has placed the obligation to support the child on the biological father, who has never had a bonding relationship with the child. Such is not the purpose of the Act or our public policy. Once the judge, in the interest of judicial economy, ruptures the father/child relationship, the judge cannot return the parties to the position they were in prior to the blood test, no matter how wise or great his or her judicial power. That is a fact of life.

. . . .

". . . Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child, including physical, mental, and emotional needs. The shifting of paternity

from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child. Although someone may suffer, it should never be the child, who is totally innocent and who has no control over or conception of the environment into which he or she has been placed. *In re Marriage of Ross*, 13 Kan. App. 2d 402, 772 P.2d 288 (1989).

"Under the facts of this case, the district judge abused his discretion. The mere filing of a paternity action does not automatically imply that the action is in the child's best interests. A court must reach this conclusion independently based on the facts in the record *McDaniels v. Carlson*, 108 Wash. 2d at 313. We realize, of course, that Charles' paternity has been determined and cannot be undone; however, our decision in this case will have meaningful application to similar cases in the future." 245 Kan. at 601-02.

Here, the district court found that Rick acknowledged paternity of the children in a verified writing. Although his acknowledgment of paternity was not made on forms that included a written description of the rights and responsibilities of acknowledging paternity, as described in K.S.A. 38-1138(a) and (b), his acknowledgment is not invalid for that reason, K.S.A. 38-1138(d). An acknowledgment of paternity "creates a permanent father and child relationship which can only be ended by court order." K.S.A. 38-1138(b)(1). An acknowledgment of paternity also creates legally enforceable duties of care and support of the child as well as rights of custody and parenting time that can only be altered by court order. K.S.A. 38-1138(b)(2) and (3). In Rick's case, where the father and child relationship always existed and he always fulfilled the duties of care and support, his acknowledgment of paternity amounted to a written confirmation of his commitment to his fatherhood of J.D. and J.N. The district court appropriately treated Rick's acknowledgment of paternity as valid.

With regard to Rick's paternity, moreover, K.S.A. 38-1114(a)(1) provides that "[a] man is presumed to be the father of a child if . . . [t]he man and the child's mother are, or have been, married to each other and the child is born during the marriage . . . ." Because [J.D.] and [J.N.] were born while Rick and Carol were married, the statutory presumption arises that Rick is the father of the children.

K.S.A. 38-1114(b) provides that the presumption may be rebutted only by clear and convincing evidence. The district court cor-

rectly concluded that Carol did not present clear and convincing evidence that would rebut the presumption of Rick's paternity. According to the district court, although genetic testing has established that Rick is not the biological father of the children, there is no credible suggestion of anyone else's paternity. The court observed that Carol's claim that the children were conceived through artificial insemination of semen donated by Steve Triple was unsubstantiated, contradicted by the testimony of a friend, and seemingly contradicted by the genetic testing results, which suggested that the children do not have the same father. The district court expressly found that "Carol's testimony lacks credibility on this issue."

Carol contends that the presumption was rebutted by evidence of the paternity test results, which Rick entered into evidence. The cover letters on the test results are dated January 11, 1993. Although the letters informed Rick that he could not be the biological father of either child, he continued to fulfill the paternal responsibilities for care and support of the children. In his subsequent actions, Rick has demonstrated his ongoing commitment to paternity. His verified petition for divorce, filed in 2000, included written acknowledgment of his paternity of the children. In the divorce proceedings, he willingly became obligated to support the children and sought custody of them. Rick's offering of the paternity test results into evidence manifestly was not intended to rebut the presumption in his favor, and, in the circumstances of this case, the district court acted properly in not considering the test results for that purpose. K.S.A. 38-1114(b) provides that a presumption of paternity may be rebutted, not that evidence contrary to biological paternity must necessarily overcome a presumption. "The stated purpose of the [Kansas Parentage] Act is to ensure that the legal obligations, rights, privileges, duties, and obligations incident to . . . the father/child relationship are carried out." *In re Marriage of Ross*, 245 Kan. at 595. That purpose would not have been furthered by the district court's finding that the presumption of Rick's paternity, which he willingly acknowledged, was rebutted by evidence offered by him as relevant to some other question. The district court acted, as required by the Act, in the best interests of

the children in the circumstances by not permitting Rick's paternity presumption to be undermined where there is no other credible suggestion of paternity. As the court stated in *Ross*, the bastardization of the children would achieve none of the purposes of the Act. 245 Kan. at 597.

Carol argues that Rick is not the children's father and has never adopted them, that Kansas does not recognize equitable adoption, that the name and whereabouts of the biological father are known, that artificial insemination law is the key to paternity, and that it would be an unacceptable fiction if Rick were determined to be the father of the children. She further argues that because Rick is not the children's father, the district court erred in placing them in primary residency with Rick without finding that the mother was unfit or that the children were in need of care. The statutory presumption that Rick is the father of the children was established in the district court due to the lack of clear and convincing evidence rebutting it. Carol has not challenged the district court's findings of fact on appeal. There is no basis, therefore, for her arguments on appeal, all of which are premised on her contention that Rick is not the father of the children.

Finally, Carol argues that the district court abused its discretion in placing the children in primary residency with Rick because the children told the trial judge that they would prefer primary residency with their mother. She contends that the children's preference coupled with all other circumstances of the case should have convinced the district court to place the children in primary residency with her. In fact, it was all other circumstances of the case that undoubtedly convinced the trial judge to place the children in primary residency with Rick in spite of their expressed preference otherwise. We find no abuse of discretion by the trial judge.

Affirmed.