(210 P.3d 640)
No. 95,914

IN THE MATTER OF THE ADOPTION OF A.A.T., A Minor Child.

Opinion filed December 22, 2006.

*Rachael K. Pirner* and *Paula D. Langworthy*, of Triplett, Woolf & Garretson, LLC, of Wichita, for appellants.

*William A. Vickery*, of Wichita, for appellee.

Before PIERRON, P.J., JOHNSON, J., and BUKATY, S.J.

JOHNSON, J.: This is an interim appeal in an action brought by M.P., the alleged natural father of A.A.T., to set aside A.A.T.'s adoption based on the denial of his right to notice and an opportunity to be heard in the adoption proceedings. The adoptive parents appeal the district court's ruling that a best interests of the child hearing, pursuant to the holding in *In re Marriage of Ross*, 245 Kan 591, 601, 783 P.2d 331 (1989), was not a prerequisite to deoxyribonucleic acid (DNA) testing to determine whether M.P. is, in fact, the biological father of A.A.T. We affirm the district court's order for DNA testing, sans further hearing, and remand for a resumption of the proceedings.

The unfortunate plight of the parties involved in this action resulted from the natural mother's having blatantly lied to virtually everyone connected with this proceeding. Unfortunately, the mother's prevarication and perjury were not discovered until 4 months after the challenged adoption decree was final.

Mother became pregnant while living in New York, at a time during which she claims to have been having sex exclusively with M.P. Mother informed M.P. in October 2003 that she was pregnant. She returned to Kansas just before Thanksgiving, ostensibly to see her family. M.P. was unaware that Mother had purchased a one-way ticket. Mother did not return to New York, albeit she continued to tell M.P. that she intended to return.

In January, Mother falsely told M.P. that she had aborted the pregnancy. She later justified her lie by saying that she had decided to place the baby for adoption and she did not think that M.P. would consent to an adoption.

A.A.T. was born June 24, 2004. The adoptive parents were given temporary custody and took A.A.T. from the hospital. Mother told

her mother, family, and friends that her child had died shortly after birth.

The adoption petition was filed a week later. In conjunction with that proceeding, Mother executed an affidavit which contained a false name for the putative father and which alleged that the father had been unwilling to assist during the pregnancy and that Mother had no way to contact the father. Subsequently, telephone records would reveal that Mother and M.P. had numerous contacts between November 2003 and December 2004.

A guardian ad litem (GAL) was appointed to represent the putative father in the adoption proceedings. After interviewing the Mother, the GAL filed an affidavit with the court, relating Mother's falsehoods, including the putative father's incorrect surname and a false address in New York. The report also inaccurately alleged that Mother had not contacted the putative father since her second month of pregnancy, but that the father was aware of her intent to place the baby for adoption.

Notice was given by publication to the incorrectly named putative father in the incorrect county of residence. Not surprisingly, no biological father appeared in the adoption proceeding. The adoption was finalized on August 24, 2004.

However, Mother's involvement was not complete. In a telephone conversation on December 24, 2004, Mother told M.P. that she had lied about the abortion and that the child had been placed for adoption. M.P. asserts that this was his first knowledge of the child.

M.P. then contacted Kansas counsel, who filed a petition to set aside the adoption on February 2, 2005. The adoptive parents answered and moved to dismiss. At a March 23, 2005, hearing, the district court ordered the matter to proceed and suggested that testing should be done to determine whether M.P. was the biological father, i.e., had standing to challenge the adoption. The attorneys present agreed that the adoptive parents were entitled to a *Ross* hearing. A GAL was appointed for A.A.T.

Before a *Ross* hearing could be held, M.P. submitted a memorandum arguing that a *Ross* hearing was not applicable to the facts of this case. The district court heard argument on that issue on

September 13, 2005, and allowed both parties and the GAL to file briefs and proposed findings. Ultimately the court found that the best interests of the child test set out in *Ross* was not applicable to this factual situation and ordered that DNA testing be done without a *Ross* hearing. The adoptive parents appealed that ruling.

## JURISDICTION

Prior to appellate briefing, M.P. moved for dismissal on the basis that we lacked jurisdiction to hear the interlocutory appeal. Our motions panel ordered as follows:

"K.S.A. 59-2401(a) lists 24 different orders that may be appealed in proceedings under chapter 59, including a 'final order, decision or judgment in any probate proceeding.' The district court order of November 30, 2005, [ordering DNA testing] appears to be a 'final order' in a probate proceeding. It further appears that failing to allow an immediate appeal could prolong unnecessarily the determination of rights in a time-sensitive proceeding. The motion is denied on present showing, but the parties are directed to address the issue of appellate jurisdiction in their briefs to the panel that will consider and decide the appeal."

In his brief, M.P. contends that the denial of a *Ross* hearing is not a final order, as contemplated by K.S.A. 59-2401(a)(24). The adoptive parents contend that the district court's order was final with respect to the issue of whether a *Ross* hearing was required, which is all that is necessary to appeal under the probate code.

Appellate courts have only such appellate jurisdiction as is provided by law. Jurisdiction to entertain an appeal is conferred by statute pursuant to Article 3, § 3 of the Kansas Constitution, and it is the appellate court's duty to dismiss an appeal when the record discloses a lack of jurisdiction. *State v. Verge*, 272 Kan. 501, 521, 34 P.3d 449 (2001). Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005).

In a Chapter 60 action, "the appellate jurisdiction of the court of appeals may be invoked by appeal as a matter of right from: . . . [a] final decision in any action." K.S.A. 60-2102(a)(4). In that context, a final decision is " 'one which finally decides and disposes of the entire merits of the controversy and reserves no

further questions or directions for the future or further action of the court.' " *Plains Petroleum Co. v. First Nat'l Bank of Lamar*, 274 Kan. 74, 82, 49 P.3d 432 (2002) (quoting *State ex rel. Board of Healing Arts v. Beyrle*, 262 Kan. 507, Syl. ¶ 2, 941 P.2d 371 [1997]).

In contrast, Chapter 59 provides more liberal appeal rights. K.S.A. 59-2401(a) contains 24 subsections, the first 23 of which describe specific appealable orders which would arguably be interlocutory under the Chapter 60 rule. For example, K.S.A. 59-2401(a)(3) specifically provides that an appeal may be taken from "[a]n order setting apart or refusing to set apart a homestead or other property, or making or refusing to make an allowance of exempt property to the spouse and minor children"; subsection (a)(13) allows an appeal from "[a]n order directing or refusing to direct an allowance for the expenses of administration"; and subsection (a)(16) allows an appeal from "[a]n order adjudging a person in contempt." The section concludes with subsection (a)(24) which provides for an appeal of a "final order, decision or judgment in any probate proceeding."

The adoptive parents urge us to find that the tenor of all of the subsections of K.S.A. 59-2401(a) suggest that subsection (a)(24) is intended to allow an appeal when the isolated issue before the district court is finally decided, even though there remain other issues to be decided before the entire merits of the probate proceeding are finally determined. That argument prompts the query as to why the legislature bothered to list 23 specific interlocutory issues which can be appealed, if subsection (a)(24) means that an appeal may be taken from any finally decided *issue*. One might find it more logical to construe the Chapter 59 provision's reference to "final order, decision or judgment" to mean the same as a Chapter 60 "final decision." Thus, in Chapter 59, one can appeal a case after it has been finally decided, just as with a Chapter 60 proceeding, but, in addition, one can bring an interim appeal from the 23 specifically designated orders.

However, we are reluctant to dismiss this appeal for a couple of reasons. First, this court has already ruled that the district court's order is appealable. That ruling came at a time when piecemeal

appeals could have been avoided without undue delay. At this point, the rationale behind requiring finality does not exist. The motion panel's goal of not prolonging a time-sensitive proceeding would be defeated by a dismissal at this point.

Secondly, *Ross* suggested that the issue of paternity determination is to be treated differently. *Ross* involved a Chapter 60 proceeding with its stricter finality requirement. Nevertheless, the court observed that once a paternity test is conducted, the results cannot be undone, *i.e.*, the bell cannot be unrung. The opinion certainly intimates that the Supreme Court would hear an interim appeal on that issue.

M.P. argues that such a rationale is inapplicable here because the facts of this case make *Ross* irrelevant. However, that is the very issue presented in this appeal, *i.e.*, whether *Ross* does apply to these facts. Therefore, we will not overrule the previous ruling of this court and will retain jurisdiction to consider the merits.

## STIPULATION

The adoptive parents complain that the district court ignored a stipulation by the parties that the facts and circumstances of this case required a *Ross* hearing to be held prior to testing. The parties agree that we have unlimited review on this issue. See *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000) (review of conclusions of law is unlimited).

Appellants' first impediment is that the stipulation issue was not preserved on the record. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003) (issues not presented to district court cannot be raised on appeal). Granted, there are exceptions to this rule. However, appellants do not argue the applicability of a recognized exception. See *Smith v. Yell Bell Taxi, Inc.*, 276 Kan. 305, 311, 75 P.3d 1222 (2003) (delineating the three recognized exceptions). Instead, current counsel for the adoptive parents describes how circumstances led her to be unsure of the existence of the stipulation made by prior counsel until the appellate transcript was prepared. Such an argument is unavailing. If an attorney enters a case midstream, he or she has the respon-

sibility to ascertain what has previously transpired and to preserve any issue which may have been previously established.

Nevertheless, the issue is totally devoid of merit. A court is not bound by erroneous stipulations or admissions regarding questions of law. *Bright v. LSI Corp.*, 254 Kan. 853, 859, 869 P.2d 686 (1994). Whether a *Ross* hearing was required in this case is obviously a question of law. Quite simply, M.P.'s counsel could not stipulate to the applicability of *Ross*, any more than a prosecutor could stipulate that *Miranda* applied to a voluntary encounter between police and a citizen.

In their reply brief, the adoptive parents attempt to create a distinction without a difference. Specifically, they argue: "The parties stipulated and agreed upon questioning by the Trial Court 'that the facts and circumstances of this case demand a *Ross* hearing' [citation omitted], not that a *Ross* hearing was applicable to the facts and circumstances of this case. Therein lies the difference." Moreover, to the extent the adoptive parents contend that the parties stipulated to the presence of whatever facts and circumstances were necessary to invoke *Ross*, such a contention is negated by the district court's findings of undisputed facts. In short, appellants cannot transform a purported stipulation on a question of law into a factual stipulation.

## APPLICABILITY OF ROSS

The heart of this dispute is whether the district court was required to conduct a hearing at which it would decide whether it was in the best interests of A.A.T. for DNA testing to be conducted for the purpose of determining whether M.P. was the biological father of A.A.T. The issue involves the interpretation of statutory provisions and the holding in *Ross*, *i.e.*, legal questions subject to unlimited review. See *Smith v. Printup*, 262 Kan. 587, 604, 938 P.2d 1261 (1997) (appellate court free to substitute its judgment for that of the district court and can draw its own conclusion on legal questions presented).

Statutorily, we start with the legislative directive that "[w]hen a father or alleged father appears and asserts parental rights [in an adoption proceeding], the court *shall* determine parentage, if nec-

essary pursuant to the Kansas parentage act." (Emphasis added.) K.S.A. 59-2136(h). The Kansas Parentage Act is contained in K.S.A. 38-1110 through 38-1132. K.S.A. 38-1114(a) sets forth circumstances where a man is presumed to be the father of a child. Those circumstances include the birth or conception of the child while the man is married to the child's mother and also the situation where "[t]he man has a duty to support the child under an order of support regardless of whether the man has ever been married to the child's mother." K.S.A. 38-1114(a)(1) and (6). K.S.A. 38-1118 provides for the ordering of blood tests whenever the paternity of a child is in issue.

The application of those statutes, at least in the situation involving the K.S.A. 38-1114(a)(1) presumption, has been impacted by the *Ross* decision. Therefore, we pause to review the facts of that case.

Sylvia Ross gave birth to a child, R.A.R., while married to Robert. Subsequently, Sylvia sued Robert for divorce, alleging that he was R.A.R.'s father. The divorce was granted and eventually Sylvia and Robert were awarded joint custody of R.A.R. Three years later, Sylvia filed a petition alleging that a man named Charles was actually R.A.R.'s biological father. A GAL was appointed, who then petitioned the court to allow blood testing to determine whether Robert or Charles was R.A.R.'s biological father. Charles filed a motion to dismiss the paternity action for failure of the court to determine the best interests of the child. Charles' motion to dismiss was denied, and the GAL's motion for blood testing was granted. The district court determined that it was in the best interests of the child to know the identity of his biological father. The tests revealed that Charles was the biological father. Over the objection of both Robert and Charles, the blood test results were admitted into evidence.

The Kansas Supreme Court found that the district court had abused its discretion, opining that "[t]he mere filing of a paternity action does not automatically imply that the action is in the child's best interests," but rather "[a] court must reach this conclusion independently based on the facts in the record." *Ross*, 245 Kan. at 602. En route to its decision, our Supreme Court held:

"*When a marital relationship has been terminated*, children of the marriage need for the court to provide stability in there lives, to acknowledge that their perception of time is different from that of an adult, and to take into consideration their past relationship with their parents. Prior to ordering a blood test to determine *whether the presumed parent is the biological parent*, the district court must consider the best interests of the child, including physical, mental, and emotional needs. The *shifting of paternity from the presumed father to the biological father* could easily be detrimental to the emotional and physical well-being of any child. Although someone may suffer, it should never be the child, who is totally innocent and who has no control over or conception of the environment into which he or she has been placed. [Citation omitted.]" (Emphasis added.) *Ross*, 245 Kan. at 602.

*Ross* altered the statutory scheme for ordering paternity blood testing where a married couple has a baby, but one of the presumed parents later contests the child's parentage. In that scenario, the district court must first conduct a *Ross* hearing on the best interests of the child. See, *e.g.*, *In re Marriage of Phillips*, 274 Kan 1049, 1057-58, 58 P.3d 680 (2002); *Jensen v. Runft*, 252 Kan. 76, 78, 843 P.2d 191 (1992); *In re D.B.S.*, 20 Kan. App. 2d 438, 888 P.2d 875, *aff'd* 258 Kan. 396, 903 P.2d 1345 (1995).

Obviously, this case is factually distinguishable from *Ross*. We are not dealing with a terminated marriage, but rather with an adoption action in which the adoptive father has never claimed or been statutorily presumed to be the biological father of A.A.T. The blood tests were ordered to determine whether M.P. has standing to challenge the adoption, not for the purpose of shifting paternity from a presumed father to a biological father. An overarching theme in *Ross* was "our longstanding public policy that a child born during a marriage should not be bastardized." *Ross*, 245 Kan. at 601. That public policy has no bearing on our current scenario.

The adoptive parents argue for an expanded interpretation of *Ross*. They attempt to fit within the statutory framework by claiming that the adoptive father is a presumed father under K.S.A. 38-1114(a)(6). That subsection provides that a man is presumed to be the father of a child if he "has a duty to support the child under an order of support regardless of whether the man has ever been married to the child's mother." The adoptive parents point to K.S.A. 59-2118(b), which provides that "[t]he adoptive parent shall

be entitled to exercise all the rights of a birth parent and be subject to the liabilities of that relationship." A birth parent has a legal duty to support his or her children. Therefore, the appellants argue, the adoption decree is a court order which established a duty to support A.A.T. They claim that the adoption decree remains valid at this time, which makes the adoptive father a presumed father of A.A.T., who cannot be displaced by the biological father via blood testing without a determination that it is in the child's best interests. While creative, the argument is flawed and circuitous.

First, the adoptive parents would have us disregard the explicit language of 38-1114(a)(6) that refers to the duty of support being "under an order of support." That language connotes something more than a general duty of support. Otherwise, the words are superfluous and the provision could have simply read, "has a duty to support the child." The provision comports with the overarching purpose of the entire presumption provision if we read the language to mean that a presumption arises when a court has entered a child support order against a man, regardless of whether the man was ever married to the child's mother. By necessity, a man subject to a child support order has already been judicially determined to be the child's father. In that vein, we believe the legislative intent of K.S.A. 38-1114(a) is to create a list of circumstances where a man will be presumed to be a child's *biological* father. As such, the provision is unavailing to the adoptive father simply by virtue of a general duty to support arising from the adoption decree.

Next, the appellants must rely on the validity of the adoption decree to give the adoptive father his claimed presumption. They contend that the adoption remains valid at this time. However, M.P.'s claim is that the adoption is void as to him. If that action is successful, the adoption will be deemed a nullity and invalid ab initio. See, *e.g.*, *Sramek v. Sramek*, 17 Kan. App. 2d 573, Syl. ¶ 2, 840 P.2d 553 (1992), *rev. denied* 252 Kan. 1093 (1993) ("void judgment is an absolute nullity"). Claiming that M.P. should not be able to obtain blood testing to establish his right to challenge the validity of the adoption because the potentially void adoption decree invests the adoptive father with a presumption of fatherhood is circuitous and illogical.

Finally, the adoptive parents' contention that "there is no reason to believe that the *Ross* court was limiting its application of the best interest analysis to only protect children born while parents were married," is contradicted by the language of that opinion. As indicated in the italicized portions of the *Ross* opinion quoted before, the *Ross* opinion was contemplating the termination of marriage scenario and the potential displacement of a man who was legally presumed to be the child's biological father. Certainly, one cannot stretch the *Ross* holdings to apply to a case where the man who faces displacement is an adoptive father who has no claim to being the child's biological father.

In conclusion, we find that the district court correctly determined that a *Ross* hearing was not required prior to ordering blood testing to determine whether M.P. has standing to challenge the adoption decree as the biological father of A.A.T.

Affirmed and remanded.