No. 124,288

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of A.K.

SYLLABUS BY THE COURT

1.

According to the Kansas Parentage Act, a parent and child relationship means the legal relationship existing between a child and the child's biological or adoptive parents. K.S.A. 2021 Supp. 23-2205.

2.

A woman can be a presumptive mother under K.S.A. 2021 Supp. 23-2208(a)(4) without claiming to be a biological or adoptive mother. Such a presumption is a "legal fiction" of biological parentage in cases involving artificial insemination. Thus, a child can have two mothers rather than a mother and a father.

3.

A presumption under K.S.A. 2021 Supp. 23-2208(a)(4) does not arise or is rebutted if either the birth mother did not consent to share parenting duties or the petitioner did not notoriously recognize maternity at the time of the child's birth.

4.

A man is presumed to be the father of a child if after the child's birth, the man and the child's mother have married and, with the man's consent, the man is named as the child's father on the child's birth certificate. The statute does not say how long after the child's birth. There is no time limit set by K.S.A. 2021 Supp. 23-2208(a)(3).

1

5.

When two competing presumptions of parentage arise and conflict with each other, a district court must determine which presumption is founded on the weightier considerations of policy and logic, including the best interests of the child. K.S.A. 2021 Supp. 23-2208(c).

Appeal from Johnson District Court; ROBERT J. WONNELL, judge. Opinion filed September 16, 2022. Affirmed.

*Valerie L. Moore*, of Lenexa, for appellant A.M.

No appearance by appellees K.K. and Q.K.

Before HILL, P.J., MALONE, J., and PATRICK D. MCANANY, S.J.

HILL, J.:  The Kansas Parentage Act recognizes claims of parentage, not only based on genetics but also based on a child's circumstances. These circumstances give rise to statutory presumptions of parentage, and sometimes two presumptions can conflict. In a case of conflicting presumptions, a court must decide which presumption is based on weightier considerations of policy and logic and account for the best interests of the child.

The district court here, on remand from this court, found circumstances had created two conflicting presumptions under the Act. First, the petitioner, A.M., had established a presumption of parentage based on the circumstances before and after the child's birth. Second, the district court found that Q.K., the birth mother's husband, had established a presumption of parentage because after the child's birth, he married the child's birth mother and, with his consent, he was named as the child's father on the child's Missouri birth certificate. And the child has been living with him as part of his family since his marriage.

The court weighed the presumptions, considered the circumstances, and held that Q.K. had the weightier presumption. The court decided that it was in the child's best interests to hold that Q.K.'s presumption prevailed. From our review of the record, we see that the district court did exactly what the Act calls for—to weigh conflicting presumptions and rule for the prevailing party. We find no error by the court and affirm.

Because the presumptions of parentage involved here deal with circumstances and not genetics or biology as some caselaw mentions, we will give a detailed case history.

*A romantic relationship falls apart, a child is born, the birth mother marries a man after her child is born, and two people claim parentage.*

A.M. and K.K. began a four-year romantic relationship when they were minors. The two young women started living together. In early 2013, K.K. had an affair with W.S. and became pregnant. A.M., at first, told K.K. to have an abortion, but sometime during the pregnancy A.M. got "on board" and became more enthusiastic. A.M.'s family organized baby showers where she and K.K. both participated. A.M. attended all of K.K.'s obstetrical appointments.

K.K. gave birth in November 2013. A.M. and her mother were present in the room at the birth, and A.M. cut the umbilical cord. A.M. took time off from work to be with K.K. and the baby following the birth. A.M. referred to the child on Facebook as "[m]y girlfriend's and I['s]" child. The child was given A.M.'s last name on the original birth certificate. No father was listed on the birth certificate. A.M. said she was not permitted to sign the birth certificate because she was not biologically related to the child.

The parties continued to reside together and, at one point, were engaged to be married. But they ended their relationship in early 2015. The relationship between A.M. and K.K. contained instances of violent physical abuse initiated by both parties, including

3

throwing things, punching, kicking, and a violent altercation that ended in a serious car accident. There were physical altercations after the birth of the child, and in the presence of the child. One violent altercation involved A.M. knocking K.K. unconscious while K.K. was holding the child. A.M. stated that the physical violence was the main reason they broke up, so the child would not be in that environment.

After the breakup, A.M. continued to spend significant time with the child, mostly to accommodate her and K.K.'s work schedules. But A.M. also had the child for two weeks at a time when K.K. temporarily moved to Kentucky. K.K. met A.M. in St. Louis to facilitate the child exchanges. A.M. celebrated some birthdays and holidays with the child. A.M. paid K.K. over $1,400 for the child's day care and school expenses. The payments were labeled "child support." But A.M. said that was "mostly . . . joking." K.K. made the parenting decisions about raising the child.

K.K. met Q.K. when the child was just over a year old. In 2016, K.K. had a son with Q.K. They moved in together and married. Q.K. is not biologically related to the child that is the subject of this case. He did not meet the child until she was about 18 months old.

K.K. started temporarily denying A.M. access to the child in 2015 for a few days to two weeks at a time. Then, in January 2018, K.K. stopped A.M.'s visitation with the child. The next month, K.K. and Q.K. changed the child's last name on her birth certificate in Missouri and they added Q.K. on the birth certificate as the child's father. Q.K. prepared a petition for a stepparent adoption of the child but did not file it.

In March 2018, A.M. petitioned the Johnson County District Court for a determination of parentage, claiming that she "notoriously or in writing recognizes paternity of the child." See K.S.A. 2021 Supp. 23-2208(a)(4). The district court issued

temporary orders giving A.M. visitation time with the child every other weekend, finding that A.M. had shown "an existing de facto custody arrangement."

At a hearing in May 2018, the court found that because K.K.'s and Q.K.'s marriage was in 2016, "I can't think of any reason why [K.K.'s] current husband would be a necessary party." K.K.'s attorney agreed that the timing would not give rise to a presumption. The attorney stated, "My client's husband does not claim to be the father of the child." The court stressed that "anyone claiming to be a parent" of the child needed to be joined as a party. Q.K. did not seek to be added as a party to the case.

In June 2018, W.S. was added as a party to the action. He filed no pleadings and attended only one court hearing in October 2018. He acknowledged he was the child's biological father. He signed a voluntary relinquishment of his parental rights and consent to a stepparent adoption which stated, "I am the biological father of the minor child." No genetic testing was performed. K.K. kept in touch with W.S. for the first year after the child was born and sent him pictures of the child, but he was not present in the child's life.

At a later hearing in October 2018, the district court, on its own motion, added Q.K. as a necessary party to the action because of the evidence presented that his name appeared on the child's Missouri birth certificate. The court cited K.S.A. 2018 Supp. 23-2208(a)(3)(B).

The court appointed a guardian ad litem for the child after W.S. made an appearance due to possible competing presumptions. At the bench trial in December 2018, the GAL gave her opinion based on her independent investigation. The GAL talked to the child, various people, and was present at the trial. The GAL's investigation revealed that A.M. and K.K. had intended to coparent before the child's birth. The GAL

5

considered the time A.M. spent with the child to be parenting time. The GAL stated that it was in the best interests of the child that A.M. be considered a legal parent.

A.M. testified the child calls her "Momma or Mommy," but K.K. testified that did not begin until this litigation had started, and at A.M.'s instruction. The child calls A.M.'s parents "Poppa" and "Grandma [S.]." K.K. testified that A.M. did not have a mother-child relationship with the child. Rather, it was a friend or aunt-type relationship.

The child calls Q.K. "Dad" or "Daddy." Q.K. testified he considered the child to be his child and did not differentiate between her and his son. He signed her birth certificate because they "wanted to be a family unit" and "wanted [the child] to share the same last name as the rest of us." He asked the court "[t]o make it official" that he was the child's parent. There was testimony that the child had a "normal father and daughter relationship" with Q.K.

During this litigation, A.M. told the child that Q.K. was not her biological father. Q.K. testified that the litigation had damaged the relationships between him and the child, and between the child and her younger brother.

The district court took the matter under advisement and then ruled that A.M. could not legally establish a presumption of parentage because she was not biologically related to the child and did not enter into a coparenting agreement with K.K. The court held both W.S. and Q.K. had established presumptions of paternity, weighed the presumptions, and determined Q.K.'s presumption was founded on weightier considerations of policy and logic, and it was in the best interests of the child for Q.K. to be declared the legal parent.

*Our court reversed the district court's ruling and remanded the case.*

The district court's ruling did not stand. A.M. appealed and a panel of this court reversed, holding the district court made an error of law in determining A.M. could not establish a presumption of parentage. The panel held the presumption stated in K.S.A. 2021 Supp. 23-2208(a)(4) does not depend on a biological connection to the child, nor does it require a coparenting agreement. The panel remanded the case to the district court for further proceedings since it did not make the factual determination whether A.M. had established a presumption of parentage under the correct law. The appeal did not concern Q.K.'s presumption of parentage. *McMullin v. Kirch*, No. 121,293, 2020 WL 4377905, at *3 (Kan. App. 2020) (unpublished opinion).

On remand, no new evidence was presented. The district court found that A.M. had established a presumption of maternity because she participated in a baby shower, she posted comments on social media claiming the child was part of her family, she cut the umbilical cord, and the child was given A.M.'s last name at the time of birth. The court then weighed A.M.'s presumption against Q.K.'s presumption and concluded that Q.K. had the weightier presumption and it was in the best interests of the child that he be declared the child's father. The court considered:

- it would be easier for the child to grow up in an intact family with her younger brother;
- the history of domestic violence between A.M. and K.K.;
- the child's belief that Q.K. was her father until A.M. told her otherwise;
- Q.K. had taken the child into his home and provided years of financial support and care;
- A.M. could have initiated a parentage action years earlier but did not; and
- K.K. and Q.K.'s ability to coparent.

A.M. appeals, contending that Q.K. cannot establish a legal presumption of parentage. No one else has filed a brief.

We have combined the several issues raised by A.M. to three:

1. Did the district court err in ruling Q.K. had a competing presumption of parentage?
2. Was it an abuse of discretion for the court to disregard the GAL's recommendation when the court made its best interests of the child analysis?
3. Does the Parentage Act violate the Equal Protection Clause of the 14th Amendment to the United States Constitution because Q.K., as a man, could sign a birth certificate as a father and thus claim a statutory presumption in this parentage action, while A.M. could not sign a birth certificate as a woman claiming paternity?

*Was Q.K.'s claim of parentage untimely?*

Citing two Kansas Supreme Court opinions, *In re Parentage of M.F.*, 312 Kan. 322, 339, 475 P.3d 642 (2020), and *In re Parentage of W.L.*, 312 Kan. 367, 383, 475 P.3d 338 (2020), as authority, A.M. contends that Q.K. could not establish a presumption of parentage because any intent for him to be the child's parent did not exist at the time of the child's birth. And allowing him to create under K.S.A. 2021 Supp. 23-2208(a)(3) a presumption of parentage five years after the child's birth is contrary to public policy and caselaw. She also argues that the district court improperly skipped the key burden shifting analysis that gives parties a chance to rebut a presumption.

*The source of the statutory presumptions here is the Kansas Parentage Act.*

According to the Parentage Act, a "'parent and child relationship' means the legal relationship existing between a child and the child's biological or adoptive parents." K.S.A. 2021 Supp. 23-2205. From that definition, the Act details various aspects of these relationships. A mother and child relationship "may be established by proof of her having given birth to the child *or under this act*." (Emphasis added.) K.S.A. 2021 Supp. 23-2207. This means that other than giving birth, the law can create a relationship that can be protected. To determine a mother and child relationship "under this act," the statute lists several presumptions of "paternity" that can, when practicable, apply to determine a mother and child relationship as well. K.S.A. 2021 Supp. 23-2208(a); K.S.A. 2021 Supp. 23-2220.

A.M.'s statutory presumption is created from language in the Act found at K.S.A. 2021 Supp. 23-2208(a)(4). Q.K.'s presumption arises from K.S.A. 2021 Supp. 23-2208(a)(3). This is significant because the presumptions are different. We begin with A.M.'s presumption.

*The K.S.A. 2021 Supp. 23-2208(a)(4) presumption*

A woman can be a presumptive mother under K.S.A. 2021 Supp. 23-2208(a)(4) without claiming to be a biological or adoptive mother. Our Supreme Court has called such a presumption a "legal fiction" of biological parentage in cases involving artificial insemination. Thus, a child can have two mothers rather than a mother and a father. *M.F.*, 312 Kan. at 339; *Frazier v. Goudschaal*, 296 Kan. 730, 746-47, 295 P.3d 542 (2013). In the prior appeal in this case (which was decided after *Frazier* but before *M.F.*), the panel ruled that the petitioner could establish the same legal fiction under (a)(4) even though the pregnancy did not result from artificial insemination. See *McMullin*, 2020 WL 4377905, at *3.

9

Relying on *Frazier*, a panel of this court has also applied the K.S.A. 23-2208(a)(4) presumption to a man who had notoriously recognized paternity of a child since the child's birth or very soon after, but who was not married to the birth mother and did not claim to be the biological father. *In re E.G.S. ex rel. Larson v. Sonnier*, No. 108,778, 2013 WL 2972697, at *3-4 (Kan. App. 2013) (unpublished opinion).

Recently, our Supreme Court explained that *Frazier* "expand[ed] the definition of a biological parent to include those for whom an actual biological link was impossible but the creation of a legal fiction appropriate." *M.F.*, 312 Kan. at 344-45. But the court set a time limit for making claims of parentage under this section.

First, under K.S.A. 2019 Supp. 23-2208(a)(4), a woman need only show she "notoriously recognized her maternity, including the rights it would give her and the duties it would impose upon her." *M.F.*, 312 Kan. at 350. But the *M.F.* court also added a "constitutional overlay" to application of the (a)(4) statutory presumption based on the parental preference rule and *Troxel v. Granville*, 530 U.S. 57, 60, 73, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The court "must ultimately be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision-making about her child's care, custody, and control with the woman who is claiming parentage under the KPA." *M.F.*, 312 Kan. 322, Syl. ¶ 5.

The *M.F.* court was concerned that "[t]o interpret subsection (a)(4) of K.S.A. 2019 Supp. 23-2208 to allow anyone—even one with no relationship of any kind with the birth mother—to unilaterally pursue parenthood under this presumption has the potential to lead to unconstitutional as well as absurd results." 312 Kan. at 351. Implicitly the court recognized some claims of parentage would be so unreasonable that they should be rejected.

10

The *M.F.* court then discussed the type of evidence that could prove the birth mother's consent or the petitioner's notorious recognition of maternity, including direct or circumstantial, testimonial, or documentary evidence. 312 Kan. at 351-52. The court finally emphasized the importance of proof of timing of an acknowledgment and consent:

> "Further, as alluded to above, this case illustrates that proof of timing of an acknowledgment of maternity and a consent to share parenting is critical. The court must avoid giving either party a veto after the arrangement has been put in place and into effect at the time of the child's birth. Allowing unilateral action by either party to thwart the maternity of the other after a child has arrived and vital bonds with both have begun to form is unacceptable. On this question, we note that, under several of the KPA's presumptions, our Legislature has made the timing of the child's birth significant. See K.S.A. 2019 Supp. 23-2208(a)(1), (a)(2), (a)(3). These provisions support the idea that it is at the moment of birth when Kansas law deems a child to have either one parent or two." 312 Kan. at 352.

We note that the court referred to subsection (a)(3) of the statute in that list of presumptions that make the timing of the child's birth significant. The plain language of (a)(3), however, has no time limit. Even so, the court explained the significance of the timing of claims of parentage:

> "Designating the time of the child's birth as *the* time when a birth mother must have consented to shared parenting and a woman in K.L.'s position must notoriously recognize maternity also makes sense for another, practical reason. Although the current statutory language means we emphatically stop short of requiring a formal contractual arrangement, a demand that each individual have made up her mind as of the time of the baby's arrival incentivizes stability for that child over surmountable relationship disappointments that are bound to occur. As with existence of premeditation when a trigger is pulled, the evidence of what is in the mind of the person pulling it may come from words and actions before, during, or after the event. [Citation omitted.] In the case of the birth of a child, the crystallization of the parties' individual intents at the time the child enters the world configures the family." 312 Kan. at 352.

11

In other words, a presumption under (a)(4) does not arise or is rebutted if either the birth mother did not consent to share parenting duties or the petitioner did not notoriously recognize maternity *at the time of the child's birth*. The *M.F.* decision deals only with the creation of the (a)(4) presumption. The case does not touch on any other statutory presumption or what to do when competing presumptions arise.

There is another consideration mentioned by caselaw. Parents will be held to their decisions. In a case decided the same day as *M.F.*, the Supreme Court reiterated that a child is born with one parent or two:

> "[A] birth parent needs to make a decision and be held to it, not [be] given the power to change his or her mind whenever the bloom is off the rose of romance or it otherwise suits. A child is born with one legal parent or two. His or her birth mother does not get to change that reality once it arises by operation of law." *W.L.*, 312 Kan. at 383.

So we see that parentage can be created by birth or by operation of law through the enforcement of certain legal presumptions.

*The K.S.A. 2021 Supp. 23-2208(a)(3) presumption*

Q.K.'s presumption of paternity arose under (a)(3)(B) because he married K.K. and they added his name to the Missouri birth certificate as the child's father.

The statutes describe how these presumptions are to be treated by the courts. The K.S.A. 2021 Supp. 23-2208(a) presumptions are rebuttable by clear and convincing evidence, by a court decree establishing paternity of the child by another man, or by another presumption as provided in subsection (c). When a presumption is rebutted, "the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence." K.S.A. 2021 Supp. 23-2208(b). That burden can be

12

satisfied by a preponderance of the evidence. *M.F.*, 312 Kan. at 341-42. When two or more presumptions arise that conflict with each other, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2021 Supp. 23-2208(c).

So we start with a statutory presumption. If it is rebutted by clear and convincing evidence, then the one claiming parentage can proceed and prevail if the court is convinced that the party has shown by a preponderance of the evidence that the facts are more probably true than not true.

The deep issue A.M. raises is whether the district court erred in even getting to subsection (c) because Q.K. could not have established a legal presumption of parenthood.

The statute does not set a specific time limit in all of the subsections. K.S.A. 2021 Supp. 23-2208(a)(3)(B) states a man is presumed to be the father of a child if: "*After* the child's birth, the man and the child's mother have married . . . and: . . . with the man's consent, the man is named as the child's father on the child's birth certificate." The statute does not say how long "after" the child's birth. There is no time limit set by that section of the statute. The Legislature did limit the application of the presumptions created in sections (a)(1) and (a)(2) to "within 300 days" but did not use similar language in (a)(3). That is significant.

There is language in the Act—K.S.A. 2021 Supp. 23-2205—that defines a "'parent and child relationship' [to mean] the legal relationship existing between a child and the child's biological or adoptive parents." Q.K. is not the biological father of the child. Thus, the question is whether "the creation of a legal fiction [is] appropriate" for someone the birth mother meets and marries after the birth of the child and for whom an actual

13

biological link is impossible, but who otherwise would be a presumptive parent under K.S.A. 2021 Supp. 23-2208(a)(3). See *M.F.*, 312 Kan. at 344-45.

The *M.F.* court explained that a legal fiction was recognized in *Frazier* because when a woman is fertilized through artificial insemination, any biological link to the woman's partner is a legal fiction. *M.F.*, 312 Kan. at 339. The court also noted that recognition of the federally protected constitutional right to marry for same-sex couples may affect how the KPA is applied. *M.F.*, 312 Kan. at 337 (citing *Obergefell v. Hodges*, 576 U.S. 644, 675, 135 S. Ct. 2584, 192 L. Ed. 2d 609 [2015]). The court commented that the "creation of these legal fictions was and remains the choice of our Legislature, which has not reacted to 2013's *Frazier* or 2015's *Obergefell* with any relevant amendment of the KPA." *M.F.*, 312 Kan. at 339.

Kansas recognizes at least one other legal fiction of biological parenthood described in *In re Marriage of Ross*, 245 Kan. 591, 602, 783 P.2d 331 (1989). In *Ross*, the court held that when there is a presumed father to a child born into a marriage, the district court should consider the best interests of the child before ordering a genetic test that may reveal someone else is the child's biological father. 245 Kan. at 601-02. In *Ross*, the mother apparently brought the action because she did not like the custody arrangement with her ex-husband and wanted to use it as a bargaining chip against the suspected biological father to further her plan to have the child adopted by her current husband. The presumption in *Ross* arose when the child was born. There was no assertion, as there is here, that the mother's current husband was a presumptive father under the KPA.

The *Ross* legal fiction does not help Q.K. here because A.M.'s presumption arose before Q.K.'s presumption. Q.K.'s presumption arose in February 2018, when he signed the child's birth certificate. *Ross* supports the idea that it is the intention at birth that matters, and that paternity should not be later shifted to another person.

14

We have found no Kansas case in which a court has applied the K.S.A. 2021 Supp. 23-2208(a)(3) presumption to stepparents in the manner that the district court did here. In *Ferguson v. Winston*, 27 Kan. App. 2d 34, 37, 996 P.2d 841 (2000), this court listed several reasons that the plaintiff was the child's father, including the (a)(3) presumption because he was living together with the birth mother when the child was conceived and born and he married the birth mother after the child's birth. The court cited K.S.A. 1998 Supp. 38-1114(3) which is now K.S.A. 2021 Supp. 23-2208(a)(3). But the circumstances in *Ferguson* were much different from the facts here. After all, K.K. did not even know Q.K. until well after her child's birth.

Based on the plain language of K.S.A. 2021 Supp. 23-2208(a) with no statutory time limit, and the undisputed evidence, we hold that Q.K. has established a presumption of parentage under (a)(3)(B). He married K.K. after the birth of the child and, with his consent, he is named as the child's father on the child's birth certificate. We reject A.M.'s argument to the contrary.

*Does the "time of birth" analysis used by the Supreme Court nullify Q.K.'s presumption?*

We recognize that the Supreme Court's "time of birth" analysis in *M.F.* and *W.L.* applies only to a determination of whether a parent has notoriously recognized maternity or paternity under K.S.A. 2021 Supp. 23-2208(a)(4). But the court's concerns for preserving "vital bonds" that develop between parent and child and for the stability of the child do come into play in a case like this where A.M.'s parentage began at the birth of the child and Q.K.'s claim arose several years later.

The reasonable way for a court to consider the "time of birth" analysis in a stepparent case such as this is to consider that analysis as one more factor to be weighed. After all, the *M.F.* court was establishing a policy of preserving the "vital bonds" that begin to form at the time of birth and make incentives to create some stability for that

15

child over surmountable relationship disappointments that are bound to occur. 312 Kan. at 352.

Our ruling tracks the statutory language establishing a presumption based on a marriage "after" the child's birth and requiring the district court to resolve conflicting presumptions by determining which presumption "is founded on the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2021 Supp. 23-2208(c). When in doubt, follow the statute.

This solution reflects the purpose of the Act. The law seeks to ensure that the legal obligations, rights, privileges, duties, and obligations incident to the father and child relationship are carried out. *In re Marriage of Phillips*, 274 Kan. 1049, 1057-58, 58 P.3d 680 (2002). Every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of their parentage. *Ross*, 245 Kan. at 597. It is not in a child's best interests to undermine the presumption of paternity absent any credible suggestion of paternity in another person. *In re Parentage of Shade ex rel. Shade*, 34 Kan. App. 2d 895, Syl. ¶ 4, 126 P.3d 445 (2006). The Act can be used as both a sword and a shield.

This is a case in which two competing presumptions arise and conflict with each other. The district court determined which presumption "is founded on the weightier considerations of policy and logic, including the best interests of the child." In other words, the court followed K.S.A. 2021 Supp. 23-2208(c). We have found no fault in the court's weighing of the two presumptions. In fact, A.M. has not claimed the district court erred in making its best interests of the child analysis. We have found no legal error that would induce us to reverse the court on this issue.

*The district court did not abuse its discretion in not following the guardian ad litem's recommendation.*

A.M. argues that the district court ignored the GAL's recommendation that it was in the best interests of the child for her to be recognized as a parent.

We review a district court's best interests of a child determination for abuse of discretion. Judicial discretion is abused if judicial action

- is arbitrary, fanciful, or unreasonable—if no reasonable person would have taken the view adopted by the district court;
- is based on an error of law; or
- is based on an error of fact—if substantial competent evidence does not support a factual finding.

*State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, Syl. ¶ 4, 392 P.3d 68 (2017).

We agree with the holding of a panel of our court that stated that a GAL's recommendation on the best interests of the child is something the district court must consider, but it does not determine the case. See *Guth v. Wagner*, No. 103,398, 2010 WL 2978091, at *7 (Kan. App. 2010) (unpublished opinion). We think the district court did consider the recommendation here.

The district court mentioned the GAL only once in its journal entry. The court held that the GAL presented no evidence of problems in Q.K.'s and K.K.'s marriage or their ability to coparent the child. At a hearing on A.M.'s motion to alter or amend the judgment, the court asked about A.M.'s contention that the court did not consider the GAL's recommendation in its decision. The court then reaffirmed its judgment. At a subsequent hearing on the GAL's fees, the court emphasized the value that the GAL provided to the case.

Simply put, the district court did not agree with the GAL's opinion, but that by itself is not an abuse of discretion. It is apparent from the discussion in the later hearings that the court did not ignore the GAL's opinion entirely. A.M. does not explain how the district court erred in its best interests of the child analysis. She has shown no abuse of discretion.

*We find no equal protection violation here.*

A.M. argues that the Act is not gender neutral and that she was held to a higher standard than a similarly situated male would be held. She contends that she was at a legal disadvantage because, before *Obergefell* she could not marry, and she could not sign a voluntary acknowledgment of paternity at the time of the child's birth. She argues that the court's recognition of Q.K.'s competing presumption because he was able to sign the child's birth certificate violated equal protection because she could not sign the birth certificate as a woman. In her words, she "was not able to just sign a sheet of paper and create a presumption of parentage."

Whether a statute violates equal protection is a question of law over which appellate courts have unlimited review. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution demands that '[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws.' The guiding principle of the Equal Protection Clause is that similarly situated individuals should be treated alike." *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005).

We are not convinced. This case is not a challenge to a law preventing two women from signing a child's birth certificate or a voluntary acknowledgment of parentage, or from marrying. Instead, this is a case in which A.M. was ultimately able to establish a presumption of parentage based on K.S.A. 2021 Supp. 23-2208(a)(4). The presumptions

18

in K.S.A. 2021 Supp. 23-2208(a) are not ranked in order of importance and can be used to establish both paternity and maternity of a child. K.S.A. 2021 Supp. 23-2220.

A.M. fails to show how her equal protection rights were violated because Q.K. was also able to establish a presumption of parentage under K.S.A. 2021 Supp. 23-2208(a)(3). As the courts have applied the Act, A.M. could have signed a piece of paper that created a presumption of parentage under the written acknowledgment of maternity presumption. See K.S.A. 2021 Supp. 23-2208(a)(4); *M.F.*, 312 Kan. at 345. The district court ultimately found that A.M. did establish a presumption under (a)(4). A.M. and Q.K. were just as able to establish presumptions of parentage. Then the court's focus was on the best interests of the child.

We find no equal protection violation here.

Affirmed.